**Christian John GAUVIN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 79A02–0703–CR–289.

Court of Appeals of Indiana.

Dec. 31, 2007.

Transfer Denied March 13, 2008.

---

Steven Knecht, Vonderheide & Knecht, P.C., Lafayette, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendant–Appellant, Christian John Gauvin (Gauvin), appeals his conviction for neglect of a dependent, as a Class A felony, Ind.Code § 35–46–1–4(b)(3).

We affirm.

### ISSUES

Gauvin presents two issues for our review, which we restate as:

1. Whether the trial court properly admitted as evidence Gauvin's statements to the police; and

2. Whether his sentence is appropriate in light of the nature of the offense and his character.

### FACTS AND PROCEDURAL HISTORY

Gauvin and Cassandra Robinson (Robinson) had a daughter, A.G., born December 12, 2000. After Gauvin and Robinson divorced in December 2002, A.G. lived with Robinson. During 2003, A.G. was removed from Robinson's custody by the Department of Child Services due to Robinson's drug problems. In December 2003, A.G. was officially placed in Gauvin's custody.

In early February 2004, Gauvin and A.G. moved into Michelle Urbanus' (Michelle) house at 4101 Hillside Dr., Lafayette, Indiana, and lived there with Michelle and her two children. On February 18, 2004, Gauvin married Michelle. A.G. ini-

tially shared a room with one of Michelle's children, but a small room was built off of the attached garage for A.G. to stay in. The room had plywood floors and no ventilation for heat. The kitchen had a heating vent located near the door of the room. A rug had been placed on the floor of the room, but was removed when the family dog ate part of it.

In the spring or summer of 2004, three-year-old A.G. began arguing with Michelle. Michelle responded by spanking A.G. and hitting her in the face. Gauvin and Michelle began to tie A.G. to chairs and to tie her hands together. They would also tie A.G. up at night and tie her door closed to prevent her from wandering around the house and breaking the other children's toys. A.G. began urinating and defecating in her bed, and Gauvin and Michelle believed that it was intentional. Thereafter, they refused to let A.G. sleep in her bed and had her sleep in a large plastic tray on the floor with no bedding.

Gauvin returned home from work on March 15, 2005, and found that Michelle had tied A.G. to her booster seat and taped her mouth shut and left the house. He let A.G. out of her booster seat, removed the tape from her mouth, but when Michelle returned home, he retied A.G. in her booster seat and taped her mouth. That night, Michelle and Gauvin left A.G. tied to her booster seat with her hands tied and mouth taped shut sitting in a plastic pan in her room. Gauvin observed cuts on A.G.'s forehead, at the base of her spine, and cuts on her toes. Some of her toes were completely black and blue from bruising.

The next morning, March 16, 2005, Gauvin left the house for work where he clocked in at 5:46 a.m. The Tippecanoe County dispatch received a 911 call at about 6:18 a.m. stating that a child was choking and might be dead at 4101 Hillside Drive. Deputy Sheriff Chuck Shumard, of

the Tippecanoe County Sheriff's Office was the first officer to arrive on the scene. He found A.G.'s body lying on top of a dishwasher in the kitchen, cold to the touch with red marks and bruises all over her face and body. When the officers inspected the house they found pictures of A.G. which displayed her tied up in various positions and obviously bruised and cut. They also found her room to be noticeably cold, things were stacked on her bed, and a large plastic tray was lying on the plywood floor.

Pathologist Paul Mellen (Dr. Mellen) performed an autopsy of A.G.'s body, which revealed that she had inadequate nutrition and was dehydrated at the time of death. A.G. had suffered multiple abrasions and contusions throughout her body, many of which overlapped, making it impossible to count them. Dr. Mellen also found a fresh scalp hemorrhage, a collection of blood between the outer layers and middle layers of the covering of the brain, and hemorrhaging around the optic nerve. He believed that A.G. had suffered a blunt force injury to the head, was possibly shaken at the time of the injury, and would have been comatose or dead less than twenty-four hours after the injury.

That morning, Michelle's father drove to Gauvin's place of work, picked him up, and brought him home while officers were still at the house investigating. Tippecanoe County Detective Steve Kohne (Detective Kohne) had officers drive both Michelle and Gauvin to the Sheriff's Department in order to get their statements. When they got to the station, Gauvin and Michelle waited in the public lobby of the jail unaccompanied by law enforcement officers. Detective Michael Gillen (Detective Gillen) interviewed Gauvin from 9:14 a.m. until 10:58 a.m. and then asked Gauvin to again wait in the lobby of the jail. Detective

Gillen did not give Gauvin any *Miranda*[1] warnings prior to or during this interview. Gauvin was not told he had to stay, nor was he told he could leave at anytime.

Four hours later, Detective Kohne began interviewing Gauvin with Detective Gillen in the room. Prior to this interview session, Detective Kohne advised Gauvin: "You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to an attorney. If you cannot afford an attorney, one will be appointed for you." (Appellant's App. p. 141). During the interview session Gauvin explained much of what had happened to A.G. He explained that he had turned a blind eye to how Michelle had been disciplining A.G. to avoid arguments with Michelle. He said that he thought Michelle had knocked A.G.'s head into the wall sometime the previous weekend, but he did not seek any medical attention for A.G.

At the end of this interview session, Detective Kohne told Gauvin that he wanted to get his statements on tape and presented Gauvin with an Advice of Rights form for him to sign. Gauvin asked why he should waive his rights to an attorney if he was going to incriminate himself, to which Detective Kohne replied, "you've already incriminated yourself." (Appellant's App. p. 166). Detective Kohne handed Gauvin the form and explained:

> Before we ask you any questions you must understand your rights. You have the right to remain silent anything you say can and will be used against you in court. You have a right to talk to a lawyer for advice before we ask any question and to have him present with you during questioning if you wish. If you cannot afford a lawyer one will be appointed by the court for you. If you

decide to answer questions now without a lawyer present you will still have the right to stop answering at any time you also have the right to stop answering at any time until you talk to a lawyer. You understand those rights?

(Appellant's App. p. 114). Gauvin stated that he understood, but added that he was unsure of whether he should have a lawyer. Nevertheless, he signed the form and began explaining again what he had previously stated to Detective Kohne.

On March 23, 2005, the State filed an Information charging Gauvin with neglect of a dependent, as a class A felony, I.C. § 35-46-1-4(b)(3). Gauvin filed a Motion to Suppress all of his statements made at the jail, arguing various *Miranda* violations. The trial court held a hearing on the motion on October 30, 2006. The next day, the trial court ruled that the statements by Gauvin made while being questioned by Detective Gillen were admissible because Gauvin was not in custody at that time. Further, the trial court ruled that Gauvin's responses to Detective Kohne's interrogation made before the signing of the Advice of Rights form were inadmissible because Gauvin was in custody at that time, and the initial *Miranda* warning given to Gauvin was incomplete. However, the trial court ruled Gauvin's statements after he signed the Advice of Rights form were admissible because his prior statements were voluntary.

On October 31, 2006, the jury trial commenced. During the State's case-in-chief, recordings of Gauvin's statement to Detective Gillen and his statements after he signed the Advice of Rights form were played for the jury. After the defense's case-in-chief, the trial court permitted the State to play a recording of Gauvin's statement in response to Detective Kohne's ini-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tial interrogation, which it had previously ruled inadmissible, as rebuttal evidence. The trial ended on November 2, 2006, and that same day the jury found Gauvin guilty of neglect of a dependent, as a Class A felony. On December 15, 2006, the trial court sentenced Gauvin to fifty years imprisonment, the maximum sentence for his crime.

Gauvin now appeals. Additional facts will be presented as necessary.

## DISCUSSION AND DECISION
### I. *Miranda*

#### A. *Standard of Review*

 Gauvin argues that the trial court erred when it admitted his statements, which he made at the jail on March 16, 2005. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Payne v. State*, 854 N.E.2d 7, 13 (Ind.Ct.App.2006). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice. *Butler ex rel. Estate of Butler v. Kokomo Rehabilitation Hosp., Inc.*, 744 N.E.2d 1041, 1046 (Ind.Ct.App.2001), *trans. denied.* Moreover, we will not reverse the trial court's decision to admit evidence if that decision is sustainable on any ground. *Crawford v. State*, 770 N.E.2d 775, 780 (Ind.2002).

#### B. *Interview by Detective Gillen*

 First, Gauvin contends that the statements made in response to questions by Detective Gillen are inadmissible because he was in custody at that time, but did not receive a *Miranda* warning prior to making those statements. The Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during "custodial interrogation" without a prior *Miranda* warning. *Ritchie v. State*, 875 N.E.2d 706, 716 (Ind. 2007), *cert. denied*, 546 U.S. 828, 126 S.Ct. 42, 163 L.Ed.2d 76 (2005) (citing *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990)). More specifically, a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way" must, before being subjected to interrogation by law enforcement officers, be advised of his rights to remain silent and to the presence of an attorney and be warned that any statement he makes may be used as evidence against him. *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind.1995) (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). Statements elicited in violation of *Miranda* are generally inadmissible in a criminal trial and subject to a motion to suppress. *Brabandt v. State*, 797 N.E.2d 855, 861 (Ind.Ct.App.2003).

 The law enforcement officer's duty to give *Miranda* warnings does not attach unless there has been such a restriction on a person's freedom as to render him in custody. *Loving*, 647 N.E.2d at 1125. A person is deemed to be in custody if a reasonable person in the same circumstances would not feel free to leave. *Luna v. State*, 788 N.E.2d 832, 833 (Ind.2003). Whether a person was in custody depends upon objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned. *Loving*, 647 N.E.2d at 1125. In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct.

1526, 1529, 128 L.Ed.2d 293 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)).

> [C]ourts have identified the following factors to be significant in determining whether a person is in custody: whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene.

*Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir.1996), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 95 (1996).

Gauvin argues we should conclude that he was in custody when questioned by Detective Gillen because he was the biological father to a dead "child that had been found covered with bruises and the home was being treated as a crime scene." (Appellant's Brief. p. 31). We disagree. These facts do not support a conclusion that Gauvin was in custody, but merely show that Gauvin was likely a person with valuable information for the investigating officers.

Additionally, Gauvin points out that he asked if he could leave after this questioning session and Detective Gillen responded by asking him to wait in the lobby. Gauvin argues that his question and Detective Gillen's response shows he was in custody. We agree that Gauvin's question might show his subjective belief regarding custody—the trial court interpreted Gauvin's question as an expression of his thought that he was "free to go." (Tr. p. 103–4). Nevertheless, as we explained above, Gauvin's subjective belief does not aid us in determining whether he was actually in custody. *See Loving*, 647 N.E.2d at 1125. As for Gillen's response asking Gauvin to wait in the lobby, this response occurred after Gauvin's statements to Detective Gillen, and is therefore outside of the realm of objective circumstances, which help determine whether Gauvin was in custody at the time of his statements.

Here, the record shows the trial court orally made specific findings relevant to its conclusion that Gauvin was not in custody when questioned by Detective Gillen:

> For the first statement to Detective Gillen [Gauvin] was transported from his home to the police station along with his wife. [Gauvin] sat in the back seat, his wife sat in the front seat. They had not been arrested, they hadn't been handcuffed, and they—and they went voluntarily. They sat in the lobby without supervision. They had their cell phones, people came and went from the lobby, and they determined among themselves who would be—who would speak to Detective Gillen first and [Gauvin]—the two individuals determined that [Gauvin] would speak first.

(Tr. p. 103–4).

In addition, it is clear from the record that Detective Gillen's questions to Gauvin were not confrontational nor delivered by using pressure tactics, which supports the trial court's conclusion that Gauvin was not in custody. *See U.S. v. Griffin*, 922 F.2d 1343, 1351 (8th Cir.1990) ("Because such strong arm tactics [pressure tactics available to law enforcement] are more generally associated with formal arrest than with an informal encounter with police, the use of such tactics is identified as an indicium

of custody."); *see also Sprosty*, 79 F.3d at 641. The record establishes that Gauvin actually dominated the majority of the conversation, explaining to Detective Gillen his work situation; how he came to have custody of A.G.; how he met, moved in with, and then married Michelle; and explaining behavioral problems that A.G. had been experiencing and how he and Michelle dealt with them. Often during the conversation Detective Gillen simply responded to Gauvin's statements by saying "okay," "uh-huh," "yeah," "sure," or "right," which prompted Gauvin to continue on with his dialogue. (Appellant's App. pp. 50–112). Further, Detective Gillen was the sole officer to conduct this questioning session. *See United States v. Nishnianidze*, 342 F.3d 6, 13–14 (1st Cir. 2003), *cert. denied*, 540 U.S. 1132, 124 S.Ct. 1107, 157 L.Ed.2d 936 (2004) (relying in part on fact that three officers conducted the interview to determine the suspect was in custody). Because we agree with the trial court that Gauvin was not in custody at the time he was questioned by Detective Gillen, we conclude that the trial court did not abuse its discretion by admitting Gauvin's responses to his questions as evidence at trial.

### C. *Interrogation by Detective Kohne*

The trial court and parties have separated Gauvin's interrogation by Detective Kohne into two parts for the purpose of analysis. They identify part one as the events which took place before Gauvin was presented and signed the Advice of Rights form; and part two as being the events which took place after he signed the form. Gauvin argues that his entire interrogation session with Detective Kohne should not have been admissible as evidence because it was not given voluntarily.

#### i. *Interrogation Prior to Signing the Advice of Rights Form*

 The trial court found that the statements given by Gauvin prior to his signing the Advice of Rights form were voluntary, but that he received incomplete *Miranda* warnings. Accordingly, the trial court concluded that the statements were inadmissible, but then admitted the statements to rebut Gauvin's testimony. Gauvin contests the trial court's decision, arguing that the statements were involuntary, and should not have been admissible for any reason.

As an initial matter, we will address the inadequacy of the first warning from Detective Kohne. Specifically, Detective Kohne advised Gauvin: "You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to an attorney. If you cannot afford an attorney, one will be appointed for you." (Appellant's App. p. 141). The State concedes that Detective Kohne did not warn Gauvin that he had the rights "to have counsel present during questioning, to confer with counsel prior to questioning and to stop questioning at any time" prior to initially interrogating Gauvin, and characterizes the *Miranda* warning given to Gauvin as "incomplete." (Appellee's Br. pp. 11, 12). Thus, we need not consider whether the warning given to Gauvin before this interrogation session was a sufficient warning.

 Nonetheless, statements made by a defendant are admissible for the purpose of impeaching the defendant's trial testimony, even if the statements were obtained in violation of *Miranda*. *Page v. State*, 689 N.E.2d 707, 710 (Ind.1997) (citing *Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 645–47, 28 L.Ed.2d 1 (1971) ("The shield provided by [*Miranda* ] cannot be perverted into a license to use perjury by way of defense, free from the risk of confrontation with prior inconsistent utterances.")). Use of a defendant's statements for impeachment is restricted

only when such statements are obtained under coercion or duress. *Page*, 689 N.E.2d at 710. A statement is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *Crain v. State*, 736 N.E.2d 1223, 1231 (Ind.2000). The critical inquiry is whether the defendant's statements were induced by violence, threats, promises, or other improper influence. *Scalissi v. State*, 759 N.E.2d 618, 621 (Ind.2001). Our supreme court has provided a list of factors that may be considered when reviewing the totality of the circumstances to determine whether a statement was voluntary, which includes police coercion, the length of the interrogation, its location, its continuity, as well as the defendant's maturity, education, physical condition, and mental health. *State v. Keller*, 845 N.E.2d 154, 165 (Ind.Ct.App. 2006), *trans. denied* (citing *Miller v. State*, 770 N.E.2d 763, 767 (Ind.2002)).[2]

Gauvin has presented no accusation that his statements were induced by violence, threats, or promises. Instead, Gauvin argues primarily that the aggressive nature of the interrogation session shows that Gauvin's statements were involuntary. At the suppression hearing, Detective Kohne readily admitted that he was aggressive and accusatory when he interrogated Gauvin. However, aggressive questioning

alone does not make Gauvin's statements involuntary. *See Scalissi*, 759 N.E.2d at 621.

Further, Gauvin argues that Detective Kohne employed deceptive tactics as well. He directs our attention to a portion of the interrogation where Detective Kohne asked Gauvin who had been sodomizing A.G., and Kohne stated there were indications that she had been sodomized. Gauvin then references the pathologist reports, which do not indicate that A.G. had been sodomized. But, Gauvin does not show us—nor have we found in the record—where Gauvin introduced evidence or argument to the trial court that Detective Kohne was being deceptive when he told Gauvin that he had been presented with indications that A.G. had been sodomized. Nevertheless, even assuming for the sake of argument that Detective Kohne was being deceptive, Gauvin has not explained how these deceptive tactics overcame his free will in making his statements. *See Crain*, 736 N.E.2d at 1231. Indeed, the record supports that Gauvin disputed Detective Kohne's assertion that A.G. had been sodomized, explaining that if any such thing happened, he did not know about it.

All the same, the warnings provided by Detective Kohne, although concededly incomplete, aid our determination of whether the trial court abused its discretion by finding Gauvin's statements were voluntary, and thus available to impeach Gauvin.

---

2. Gauvin contends, "[t]he threshold question is: was the defendant adequately advised of his constitutional rights, and did the police ensure that he understood those rights before waiving them." (Appellant's Br. p. 36). For this proposition he cites to *Keller*, 845 N.E.2d at 161. However, upon review of our opinion in *Keller*, the proposition that Gauvin cites to was used by the *Keller* court to determine whether a custodial statement is admissible in the State's case-in-chief, rather than for impeachment purposes. Indeed, the *Keller* court later explained, "a statement is voluntary if, in the light of the totality of the circumstances, 'the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Id.* at 165 (quoting *Wessling v. State*, 798 N.E.2d 929, 936 (Ind.Ct.App.2003)). This is the test which we apply to determine whether Gauvin's statements were voluntary, and thus admissible to impeach.

The advisement by Kohne at this time provided basic *Miranda* warnings. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602 ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."). When Gauvin questioned why he was being warned although Kohne told him he was not under arrest at that time, Kohne explained to Gauvin "I'm going to ask you some questions that could incriminate you." (Appellant's App. p. 141).

In sum, Gauvin does not assert that his statements were induced by violence, threats, or promises, nor has he suggested how his free will was overcome by Detective Kohne's alleged deception. *See Scalissi*, 759 N.E.2d at 621. The State presented evidence that Detective Kohne advised Gauvin that he had a right to remain silent, that his statements would be used against him, and that he had a right to an attorney. Further, Detective Kohne informed Gauvin that he intended to elicit statements from Gauvin that would incriminate him. Gauvin did not present any evidence that he did not understand these advisements, or could not have understood those advisements due to a lack of maturity, education, physical capacity, or mental health. *See Keller*, 845 N.E.2d at 165. Thus, we conclude that the trial court did not abuse its discretion when it determined that these statements were voluntary, and, therefore admissible to impeach Gauvin.

### ii. *Interrogation After Signing the Advice of Rights Form*

■ Gauvin argues that the trial court abused its discretion when it admitted as evidence his statement given after he signed the Advice of Rights form. Specifically, he argues that his statement prior to signing the advice of rights form was not voluntary, and thus his statement after signing the Advice of Rights form was tainted. However, he concedes that if the first statement was unwarned, but voluntary, "it is not necessary that there be a break in the stream of events between the inadmissible statement and the later confession to insulate the latter from the effect of what occurred before. Rather, a careful and thorough administration of [*Miranda*] warnings will cure the condition that rendered the unwarned statement inadmissible." (Appellant's Br. p. 43) (citing *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 1290, 1293–94, 84 L.Ed.2d 222 (1985)). In *Elstad*, the Court held that a second statement, given after full *Miranda* warnings and waiver, was admissible, following a previous unwarned but voluntary statement. *Elstad*, 470 U.S. at 318, 105 S.Ct. 1285, 84 L.Ed.2d 222. Therefore, because we have concluded that Gauvin's prior statement was voluntary, we also conclude that the trial court did not abuse its discretion by admitting his statements made after he signed the Advice of Rights form.

### II. *Appropriateness of Gauvin's Sentence*

■ Gauvin argues that the fifty-year sentence imposed for his conviction, neglect of a dependent, as a Class A felony, is inappropriate when his character and the nature of the offense are considered. We have the authority to review the appropriateness of a sentence authorized by statute through Ind. Appellate Rule 7(B). That rule permits us to revise a sentence if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind.2007), *reh'g granted*, decision clarified on other grounds, 875 N.E.2d 218

(Ind.2007). Our supreme court has encouraged us to critically investigate sentencing decisions. *See, e.g., Walker v. State,* 747 N.E.2d 536, 538 (Ind.2001). The purpose of the express authority to review and revise sentences is to ensure that justice is done in Indiana courts and to provide unity and coherence in judicial application of the laws. *Pruitt v. State,* 834 N.E.2d 90, 121 (Ind.2005).

In reviewing the record before us, we find that Gauvin admitted to tying A.G. up, smacking her across the face, and putting tape over her mouth. In addition, Gauvin knew that his wife, Michelle, was tying A.G. up, hitting her, taping her mouth shut, and had pushed her, knocking her head into the wall. He permitted A.G. to become malnourished and dehydrated. He aided in forcing A.G. to sleep on the floor in a plastic pan in a room built off of his garage with the door tied shut, although the room had no heating vent. Ultimately, A.G. died from her mistreatment by Gauvin and his wife. We find that all of these actions speak to both Gauvin's character and the horrific nature of his offense. Thus, we conclude that the sentence imposed by the trial court is not inappropriate in light of Gauvin's character and the nature of his offense.

### CONCLUSION

Based on the foregoing reasons, we conclude that the trial court did not abuse its discretion by admitting Gauvin's statements to Detective Gillen and his second statement to Detective Kohne during the trial. Further, the trial court did not abuse its discretion by admitting Gauvin's first statement to Detective Kohne as rebuttal evidence to Gauvin's testimony. Finally, the sentence imposed by the trial court was not inappropriate in light of Gauvin's character and the nature of his offense.

Affirmed.

KIRSCH, J., and MAY, J., concur.