**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 30 2012, 9:40 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GARY L. GRINER**
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANN L. GOODWIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GERALD MCKINNEY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A04-1108-CR-450 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jane Woodward Miller, Judge
Cause No. 71D01-1010-FD-980

**March 30, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

## STATEMENT OF THE CASE

Gerald McKinney appeals his conviction for class A misdemeanor animal cruelty.[1]
We affirm.

## ISSUES

1.    Whether the trial court abused its discretion in admitting evidence.

2.    Whether the trial court abused its discretion in instructing the jury.

3.    Whether there is sufficient evidence to support the conviction.

## FACTS

On August 14, 2010, then-thirteen-year-old DeShawn Luten was home with his then-fifteen-year-old brother, Lamar, and several friends.  The boys' mother, Danielle Luten, was at work.  At some point, the family's dog, a pit bull, got out of his crate, which was inside the house, and bit DeShawn.  When the children could not get him back in the crate, Mrs. Luten came home from work and put him back in the crate.

Subsequently, the dog again escaped his crate.  The children ran out of the house, leaving the dog inside the house.  After the children telephoned their mother, she telephoned her boyfriend, McKinney, and asked him to get the dog out of the house. Eventually, McKinney and DeShawn's oldest brother, Joseph, chased the dog outside, into the fenced backyard, where DeShawn saw Joseph strike the dog once.  He thought Joseph had hit the dog with a shovel.

---

[1]  Ind. Code § 35-46-3-12.

That evening, South Bend Police Officer Chadwick Goben responded to a report that a dog had been beaten at the Luten residence. As Officer Goben spoke with Joseph, who was on the telephone with Ms. Luten, he observed "several people running around the house." (Tr. 170). In his experience, it appeared to him that they were hiding or hiding something.

Joseph told Officer Goben that Ms. Luten would like to speak to him. Officer Goben informed her that he was responding to a call regarding "loud screaming and yelling" at the house. (Tr. 170). Ms. Luten gave Officer Goben permission to enter the residence and "make sure that everybody was okay[.]" (Tr. 171).

While staying on the phone with Ms. Luten, Officer Goben entered the house and asked Joseph to bring everyone into the living room. Approximately eight people gathered in the living room; they all appeared to be in their teens, or "at the most, 20." (Tr. 174).

Officer Goben asked Ms. Luten whether the family had a dog. She responded that they did, "but earlier in the day she received a phone call from her children saying that the dog ran away . . . ." (Tr. 172). Officer Goben then walked through the house, checking to see if anyone else was there. When he entered a bedroom, he observed McKinney on the bed; McKinney appeared to be sleeping.

Without disturbing McKinney, Officer Goben continued through the house and into the backyard, where he observed a shovel next to a mound of dirt and a hole, which appeared to be freshly dug. He also observed a blanket on the ground. He noticed that

the blanket was "moving up and down as if something was underneath it." (Tr. 173). Officer Goben discovered a dog lying under the blanket. The dog appeared to have been beaten about the head. Officer Goben also noticed a baseball bat lying in the yard. The bat had what appeared to be blood on it.

Officer Goben, who had remained on the phone with Ms. Luten, informed her that "there was an issue at her residence, and she needed to come home from work . . . ." (Tr. 177). He told her that he would stay at the house until she arrived. Officer Goben then had dispatch contact Animal Care and Control.

Because McKinney appeared to be the oldest occupant in the house, Officer Goben went back inside the house and woke him. Officer Goben told him "what [he] was doing there, and the fact that [he] had spoken with Ms. Luten and what [he] had found in the back yard, and [he] needed to gather everybody up and find out what was going on and why the dog was in the back yard." (Tr. 178). McKinney agreed to help.

By this time, other officers had arrived. With everyone gathered in the living room, Officer Goben "asked them why the dog was like that." (Tr. 181). Everyone denied knowing anything about the dog's condition. After McKinney encouraged the teenagers to tell the truth, Joseph explained that the dog "had escaped from its cage and started attacking his younger brother, DeShawn. At that point in time, everybody ran out of the house." (Tr. 182).

Animal Control Officer Charles LeMaire arrived approximately thirty minutes later. An officer immediately took him to the dog in the backyard. LeMaire observed

4

that the dog's breathing was labored. He also observed that the dog "was covered in blood. Its eye was popped out of its socket and hanging down about a half inch to an inch below the eye socket. The skull appeared crushed. The jaw appeared broken completely on both sides, and it was hanging loose[.]" (Tr. 203). LeMaire sedated the dog and then checked it for other broken bones. When he turned the dog over, he discovered a second baseball bat, with what appeared to be blood on it, underneath the dog. After performing a cursory examination of the dog, LeMaire carried the dog to his truck. LeMaire subsequently determined that the dog's injuries necessitated it being euthanized.

After taking the dog to his truck, LeMaire returned to the residence, where he found several people, including McKinney, Ms. Luten, and Lamar, congregated in the kitchen. When Lamar denied knowing what had happened to the dog, LeMaire indicated that he believed Lamar was lying and told him he "need[ed] to tell [them] who hit that dog." (Tr. 211). Lamar then pointed to McKinney "and he said to him directly, you did it." (Tr. 213). When McKinney acted surprised and questioned, "I do [sic] it?" (Tr. 213). Lamar answered, "yeah, you beat that dog down." (Tr. 213). LeMaire therefore asked McKinney whether he had hit the dog. McKinney admitted that he "did it." (Tr. 232). McKinney explained that he hit the dog with a baseball bat when the dog charged him while inside the house. LeMaire indicated that "that's fine" because McKinney was protecting himself and then asked Lamar who hit the dog in the backyard. (Tr. 233).

Lamar "looked directly at Mr. McKinney and said, you beat the dog down in the back yard." (Tr. 233). McKinney "said, in the same surprised tone of voice and mannerism, I did it in the back yard?" (Tr. 234). Lamar responded, "yeah, you did it." (Tr. 234). When LeMaire asked McKinney whether that was true, McKinney answered, "yeah, I did it in the back yard." (Tr. 234).

During LeMaire's conversation with Lamar and McKinney, Officer Goben stood in the doorway between the kitchen and living room but did not ask any questions of McKinney. The police officers were at the residence a "couple hours" and made no arrest that evening. (Tr. 187).

On October 1, 2010, the State charged McKinney with Count 1, class D felony mutilating an animal; and Count 2, class A misdemeanor animal cruelty. On January 6, 2011, McKinney, by counsel, filed a motion to suppress his statements to LeMaire. The trial court held a hearing on the motion, during which the State conceded that LeMaire was acting as an agent for the State on August 14, 2010. The trial court denied the motion.

The trial court commenced a two-day trial on June 23, 2011, during which the trial court admitted into evidence, over McKinney's objection, LeMaire's testimony regarding McKinney's admissions. The jury found McKinney not guilty of mutilating an animal and guilty of class A misdemeanor animal cruelty. The trial court held a sentencing hearing on July 22, 20100, after which the trial court sentenced McKinney to one year.

Additional facts will be provided as necessary.

6

DECISION

1. Admission of Evidence

McKinney asserts that the trial court improperly admitted his statements to LeMaire because the statements were made without *Miranda* warnings. Specifically, McKinney argues that he was in custody when he made his statements because he was not free to leave.

The admission or exclusion of evidence is a matter left to the sound discretion of the trial court. *Terry v. State*, 857 N.E.2d 396, 409 (Ind. Ct. App. 2006), *trans. denied*. On review, we will not reweigh the evidence. *Id.* "Instead, we will consider all conflicting evidence in favor of the trial court's ruling, and only the uncontested evidence favorable to the defendant." *Id.*

*Miranda* warnings are based upon the Fifth Amendment's privilege against self-incrimination, and were designed to protect an individual from being compelled to testify against himself. *Gibson v. State*, 733 N.E.2d 945, 952 (Ind. Ct. App. 2000). Police officers are not required to give a defendant a *Miranda* warning unless the defendant is in custody and subject to interrogation. *Id.* "Police cannot avoid their duty under *Miranda* by attempting to have someone act as their agent in order to bypass the *Miranda* requirements." *S.G. v. State*, 956 N.E.2d 668, 680 (Ind. Ct. App. 2011).

> A person is deemed to be in custody if a reasonable person in the same circumstances would not feel free to leave. Whether a person was in custody depends upon objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned. In

7

determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

G*auvin v. State*, 878 N.E.2d 515, 520-21 (Ind. Ct. App. 2007) (internal citations omitted), *trans. denied*. Among the factors determined to be significant in determining whether a person is in custody are the following:

> whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene.

*Id.* at 521 (quoting *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996), *cert. denied,* 519 U.S. 854 (1996)).

Here, Mrs. Luten gave the police officers permission to enter the home; the police officers stood apart from everyone in the kitchen while LeMaire spoke with several people, including McKinney; LeMaire did not make McKinney the sole object of his inquiries; the police officers in no way physically restrained McKinney or curtailed his movement; LeMaire did not subject McKinney to accusatory questioning; and LeMaire only inquire into the truth of Lamar's statements.

8

We cannot say that the facts support a conclusion that McKinney was in custody when LeMaire questioned him. According, we find no abuse of discretion in admitting McKinney's statements to LeMaire.

## 2. Jury Instructions

McKinney asserts that the trial court abused its discretion in instructing the jury on accomplice liability. He argues that "there was no evidence in the record to support such an instruction." McKinney's Br. at 9.

> "The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." "Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion." "In reviewing a trial court's decision to give or refuse tendered jury instructions," this Court "considers: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions which are given."

*Gravens v. State*, 836 N.E.2d 490, 493 (Ind. Ct. App. 2005) (internal citations omitted), *trans. denied*.

> The pertinent instructions read as follows:
>
> The crime of cruelty to an animal is defined by law as follows:
>
> A person who knowingly or intentionally beats a vertebrate animal commits cruelty to an animal, a Class A misdemeanor.
>
> Before you may convict the Defendant of cruelty to an animal, a Class A misdemeanor, the State must have proved each of the following beyond a reasonable doubt:

9

1.     The defendant, Gerald McKinney
2.     knowingly
3.     beat
4.     a vertebrate animal, to wit: a dog[.]

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the defendant not guilty of cruelty to an animal, a Class A misdemeanor . . . .

If the State did prove each of these elements beyond a reasonable doubt, you may find the defendant guilty of cruelty to a vertebrate animal, a class A misdemeanor . . . .

(App. 31).

A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person:

1.     has not been prosecuted for the offense;
2.     has not been convicted of the offense; or
3.     has been acquitted of the offense.

The acts of one person are attributable to all who are knowingly or intentionally acting together during the commission of a crime. Accordingly, although the State need not prove, beyond a reasonable doubt, that the defendant personally, and acting by himself, committed all of the elements of the crime with which he is charged, the State must prove, beyond a reasonable doubt that the defendant engaged in some affirmative conduct aiding, inducing, or causing another person to commit the charged offense and the defendant and another person or persons, knowingly or intentionally acting together, committed all of the elements of the crime with which the defendant is charged.

(App. 34).

Under the theory of accomplice liability, an individual who aids, induces, or causes the commission of a crime is equally as culpable as the person who actually commits the offense. I.C. § 35–41–2–4.

10

The accomplice liability statute does not set forth a separate crime, but merely provides a separate basis of liability for the crime that is charged. Therefore, where the circumstances of the case raise a reasonable inference that the defendant acted as an accomplice, it is appropriate to instruct the jury on accomplice liability even where the defendant was charged as a principal. "While the defendant's presence during the commission of the crime or the failure to oppose the crime are, by themselves, insufficient to establish accomplice liability, they may be considered along with other facts and circumstances tending to show participation."

*Brooks v. State*, 895 N.E.2d 130, 133 (Ind. Ct. App. 2008) (internal citations omitted).

The record reveals that McKinney and Joseph chased the dog through the house and into the yard. Officers found two bloody baseball bats lying in the yard, near the dog, which had beaten. DeShawn testified that he saw Joseph hit the dog. McKinney admitted to striking the dog both inside and outside the house.

The State presented sufficient evidence from which the jury could infer that McKinney and Joseph acted together in beating the dog. Given that the evidence supports the instruction on accomplice liability, we cannot say that the trial court abused its discretion by giving this instruction.

3. Sufficiency of the Evidence

McKinney asserts that the evidence is insufficient to support his conviction.

When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences <u>supporting</u> the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not

11

necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (quotations and citations omitted).

Indiana Code section 35-46-3-12(b) provides that "[a] person who knowingly or intentionally beats a vertebrate animal commits cruelty to an animal[.]" "Beat" is defined as "to unnecessarily or cruelly strike an animal, or to throw the animal against an object causing the animal to suffer severe pain or injury." I.C. § 35–46–3–0.5(2). "[U]nder the statute, a person 'beats' a vertebrate animal when he needlessly strikes an animal or strikes an animal so as to cause pain or suffering." *Tooley v. State*, 911 N.E.2d 721, 724 (Ind. Ct. App. 2009), *trans. denied*.

DeShawn testified that McKinney chased the dog until it went outside. Once outside, the dog no longer posed a threat to anyone inside the house. Instead of leaving the dog, however, McKinney admittedly struck the dog. The dog suffered extensive injuries consistent with being struck multiple times. The dog's injuries included a crushed skull, broken jaw and a displaced eyeball. Officers later discovered two bloody baseball bats in the yard.

Given these facts, the jury could reasonably infer that McKinney needlessly struck the dog or did so in a manner so as to cause pain and suffering to the dog. McKinney is asking this Court to reweigh the evidence, which we will not do.

Affirmed.

BAKER, J., and BAILEY, J., concur.