## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 28 2016, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher J. Petersen
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Leon C. Sieg,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 28, 2016

Court of Appeals Case No.
20A05-1512-CR-2144

Appeal from the Elkhart Superior
Court

The Honorable Evan S. Roberts,
Judge

Trial Court Cause No.
20D01-1402-FD-211

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Leon C. Sieg (Sieg), appeals his conviction for strangulation, a Class D felony, Ind. Code § 35-42-2-9(b)(1) (2013); and domestic battery, a Class D felony, I.C. §§ 35-42-2-1.3(a)(2),(b)(1)(A) (2013).

[2] We affirm.

## ISSUE

[3] Sieg raises one issue on appeal, which we restate as follows: Whether the trial court abused its discretion in admitting certain audio recordings into evidence.

## FACTS AND PROCEDURAL HISTORY

[4] On February 26, 2014, at approximately 5:10 p.m., the Elkhart City Police Department received a 911 call. The caller, who identified herself as Amanda Elsworth (Elsworth), reported that she was located near the intersection of Division Street and Main Street in Elkhart, Elkhart County, Indiana, and was observing an ongoing altercation "in the middle of the street." (State's Exh. 101). Elsworth stated that "there's this couple . . . the guy has his hands around her neck and was beating on her." (State's Exh. 101). When asked for a description of the couple, Elsworth stated that "[t]hey both had coats on. She has shorter hair. He's got a hat on." (State's Exh. 101). The Elkhart City Police Department subsequently dispatched Corporal Jason Runyan (Corporal Runyan) to investigate the report. When Corporal Runyan arrived at the area of Division Street and Main Street, nobody was there.

[5] Approximately twenty minutes later, the Elkhart City Police Department received another 911 call. The caller, a male, urgently stated, "Y'all need to come over here to 303 Waterfall Drive cuz this man is beating the shit out of his woman." (State's Exh. 102). While attempting to glean more information from the caller, the dispatcher referred to two people who were "beating the shit out of each other." (State's Exh. 102). The caller quickly corrected the dispatcher, stating, "No he's beating the shit outta the woman. I didn't say nothing about each other. God damn y'all. . . . Get over here and get this man off this woman." (State's Exh. 102). The caller indicated that the altercation was occurring "in the hall" on the "first floor" but added that "the apartment number is 804." (State's Exh. 102). When the dispatcher asked for the caller's name, he said, "I ain't gonna give my business, I'm just . . . a witness." (State's Exh. 102). Again, Corporal Runyan was dispatched to respond to the call.

[6] When Corporal Runyan arrived at the apartment complex at 303 Waterfall Drive, he did not observe any disturbances on the first floor, so he proceeded to Apartment 804. The door was either ajar or unlocked, so Corporal Runyan "went in to check and make sure everybody was okay[,] and there was nobody in that apartment." (Tr. p. 225). However, a neighboring resident informed Corporal Runyan that "possibly the female was [in] [A]partment 901." (Tr. p.

225).  When Corporal Runyan went upstairs to Apartment 901, he found Peachie New (New),[1] who "was visibly upset and crying."  (Tr. p. 226).

[7]  New informed Corporal Runyan that she and her fiancé, Sieg, had been at Bowly's Bar, which is located at "Main Street and Freight Street, about a block south of Main and Division."  (Tr. p. 230).  When they left the bar, Sieg "was mad.  He grabbed the back of [New's] hair and started dragging her down [Division] [S]treet."  (Tr. p. 232).  "She said that the back of her head hurt.  When he was pulling her, she hit her right shoulder and that her shoulder was hurting."  (Tr. p. 233).  Sieg also "picked her up and put his hand around her throat, strangling her up against a building," which temporarily obstructed her ability to breathe.  (Tr. p. 233).  Sieg continued to drag New down the street until they reached the Waterfall Drive apartment complex, where they lived.  New stated that while in the elevator, Sieg threw her down and "punched her in the face several times."  (Tr. p. 233).  When they reached their apartment, Apartment 804, Sieg "threw her on the bed, again, strangled her with his hands, [and] punched her a couple more times."  (Tr. p. 233).  New again stated that she was unable to breathe when he had his hands around her neck.  When New informed Sieg that she was going to call the police, "[h]e called her a bitch and took off."  (Tr. p. 234).  Although New never personally called the police, "[s]he was scared," and she went to Apartment 901 to hide from him.  (Tr. p. 234).  Corporal Runyan observed that New "had some marks . . . on the right

---

[1]  By the time of trial, New had married the defendant and taken his name, Sieg.

side of her neck—and then she also had a cut on the inside of her lip." (Tr. p. 234).

[8] After obtaining a description of Sieg from New, Corporal Runyan radioed other Elkhart police officers to be on the lookout for him. Because Sieg was in possession of New's cell phone when he left the apartment, a dispatch officer called the phone in an attempt to ascertain his location. Sieg answered, and after learning that the call was from the Elkhart City Police Department, he stated that he "didn't do shit." (State's Exh. 103). However, when the dispatch officer explained that he was trying to ensure everybody's safety, Sieg responded, "I'm alright, man, I left the house. I got angry and then I pushed her around . . . . I aggravated a few people in the apartment building and I'm sorry, but that's it." (State's Exh. 103). When the dispatch officer asked for Sieg's location, Sieg hung up. After the dispatch officer called back, Sieg yelled out a few strongly-worded insults before hanging up again.

[9] Upon hearing the dispatch to be on the lookout for Sieg, Elkhart City Police Corporal Andy Chrobot (Corporal Chrobot) began searching areas near the apartment complex. "At Jackson and Johnson, [he] saw a subject that roughly matched the description of the accused." (Tr. p. 273). Corporal Chrobot attempted to make contact, but the man continued walking. Corporal Chrobot closed in on him and loudly asked for his identification. The man responded, "Leon [*i.e.*, Sieg]. . . . You got me." (Tr. 274). Corporal Chrobot placed Sieg under arrest.

[10] On February 28, 2014, the State filed an Information, charging Sieg with Count I, strangulation, a Class D felony, I.C. § 35-42-2-9(b)(1) (2013); and Count II, domestic battery, a Class A misdemeanor, I.C. § 35-42-2-1.3(a)(2) (2013). On January 22, 2015, the State amended the Information by adding an enhancement charge as Count III, domestic battery with a previous, unrelated domestic battery conviction, a Class D felony, I.C. §§ 35-42-2-1.3(a)(2),(b)(1)(A) (2013).

[11] On October 14-15, 2015, the trial court conducted a jury trial. By this time, New, who was married to Sieg, had retracted her statement. Thus, to prove its case, the State relied primarily on the testimony of Corporal Runyan, who recounted the statements New made to him immediately after the incident while she was upset, as well as photographic evidence of the injuries New sustained. In addition, during the State's case-in-chief, the trial court admitted, over Sieg's objection, the audio recordings of the two 911 calls made by Elsworth and the anonymous man. Also over Sieg's objection, the trial court admitted an audio recording of a March 18, 2014 telephone conversation between Sieg and another man while Sieg was incarcerated awaiting trial. In this phone conversation, Sieg expressed that he believed that he was likely to get time because of New's statement to the police. Sieg stated, "I'll admit that I put my hands on her. I didn't do the other choke [(inaudible)]. No way. Fuck that shit. . . . Strangulation, fuck that, that's three years. I'll do the . . . domestic, that's only a year, maybe six months. I could do that on my head, you know." (State's Exh. 104(b)).

[12] During the defense's case-in-chief, New testified. Despite her contrary sworn statement, she claimed that Sieg never strangled or punched her. Instead, she stated that when she spoke to Sieg while he was in jail, he had reminded her that she was very intoxicated, and she nearly fell into the street, at which point Sieg had "grabbed [her] and he dragged [her] to the sidewalk" in order to save her from being hit by a vehicle. (Tr. p. 356). She thus testified that the observable marks on her body would have been the result of him pulling her out of the street to save her life, and that the cut on her lip was just a cold sore.

[13] At the close of the evidence, the jury returned guilty verdicts as to both Counts I and II. Thereafter, Sieg stipulated that he had a prior conviction for battery, and the trial court found him guilty of Count III as well. On November 9, 2015, the trial court held a sentencing hearing. The trial court vacated Count II and entered a judgment of conviction on Counts I and III, both Class D felonies. The trial court ordered Sieg to serve three years on Count I, fully executed in the Indiana Department of Correction. For Count III, the trial court imposed a consecutive one-year suspended sentence.

[14] Sieg now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[15] Sieg challenges the trial court's admission of certain evidence. A trial court is vested with sound discretion in ruling on the admissibility of evidence. *Wise v. State*, 26 N.E.3d 137, 140-41 (Ind. Ct. App. 2015), *trans. denied*. On appeal, we

will uphold an evidentiary ruling unless the trial court has abused its discretion. *Id.* at 141. A trial court abuses its discretion if its decision "is clearly against the logic and effect of the facts and circumstances before it." *Id.* However, even if the trial court abuses its discretion, we will not disturb the judgment so long as the admission or exclusion of evidence results in harmless error, which is error that does not affect the defendant's substantial rights. *Duncan v. State*, 23 N.E.3d 805, 809, 811 (Ind. Ct. App. 2014), *trans. denied*.

## II. *Audio Recordings*

### A. *911 Call*

[16] Sieg first claims that the trial court abused its discretion "by admitting into evidence the audio recording of a 911 call . . . in which the declarant on the recording spoke about a man engaged in a physical altercation with the woman." (Appellant's Br. p. 5). As the State points out, there were two separate audio recordings of 911 calls admitted into evidence, in both of which the caller reported that a man was beating up a woman. Thus, the State argues that Sieg has waived this claim for appeal because he has failed to specify to which recording he objects. We agree. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring that a party's argument be supported, in part, by "cogent reasoning" and citations to the record). Nevertheless, in his argument, Sieg contends that the caller refused to identify himself to the dispatcher. Because the first 911 caller identified herself as Elsworth, we are able to discern that Sieg's argument concerns the second 911 call made by the male from the apartment complex on

Waterfall Drive (*i.e.*, State's Exhibit 102). As such, we elect to address Sieg's argument on the merits waiver notwithstanding.

[17] According to Sieg, "the contents of the audio are inadmissible hearsay and . . . it is impossible to cross-examine this declarant." (Appellant's Br. p. 5). Because the unidentified caller was not available for cross-examination, Sieg maintains that "this falls under the 'silent witness' theory, requiring a heightened standard of authentication." (Appellant's Br. p. 5). Pursuant to Indiana Evidence Rule 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

[18] Once again, the State argues that Sieg has waived his argument for appeal because Sieg has advanced a different theory on appeal than his grounds for objection during the trial. It is well established that "[a]n objection to the admissibility of evidence must state with specificity the grounds for the objection. Any other grounds not argued before the trial court with respect to that evidence are waived." *Porter v. State*, 700 N.E.2d 805, 806 (Ind. Ct. App. 1998) (citation omitted). In this case, Sieg objected to the admission of the 911 call at trial on grounds of inadequate foundation and authentication, specifically asserting that the caller should have been identified.[2] Because Sieg

---

[2] Sieg also raised a hearsay objection, contending that it would be highly prejudicial to the defense if the audio recording was published to the jury. However, we find that Sieg has waived any hearsay argument on appeal by failing to develop a cogent, appropriately-cited argument. App. R. 46(A)(8)(a).

challenged only the lack of the caller's identification before the trial court and did not contend that the audio recording was not capable of being authenticated under the silent witness theory, the argument is waived.[3]

[19]     Sieg's silent witness argument aside, we find no merit in his contention that proper authentication of the 911 call required the caller's identification. At trial, Sieg relied on *King v. State*, 560 N.E.2d 491, 494-95 (Ind. 1990), in which our supreme court discussed a longstanding requirement

> that a caller's identity be established as a foundation for the admission of the content of [a] telephone call. The identity of the caller need not be proved beyond a reasonable doubt; identity of the declarant may be established by circumstantial evidence; and conflicts in the proof of the identity go to the weight of the evidence and not the admissibility.

However, in *Young v. State*, 696 N.E.2d 386, 389 (Ind. 1998), the supreme court stated that "[a] telephone call to a 911 system may not always require such authentication where the point of submitting it as evidence is not really to establish the identification of the caller." In the present case, the caller's identity was not at issue. Rather, the admission of the 911 call established how

---

[3] We note that the silent witness theory allows for the admission of photographs and video recordings "as substantive evidence, so long as that evidence is also relevant." *Sheckles v. State*, 24 N.E.3d 978, 986 (Ind. Ct. App. 2015), *trans. denied*. Our courts have not yet applied the foundational requirements of the silent witness theory to audio recordings of phone calls. The theory applies "where there is no one who can testify as to [the photograph's or video recording's] accuracy and authenticity because the photograph [or video recording] must 'speak for itself' and because such a 'silent witness' cannot be cross-examined." *Wise*, 26 N.E.3d at 141. Admission under the silent witness theory requires "a strong showing of the photograph's [or video recording's] competency and authenticity." *Id.*

the police discovered the crime scene. *See id.* At trial, Corporal Runyan identified the recording (*i.e.*, State's Exhibit 102) as the 911 call that the Elkhart City Police Department received at approximately 5:30 p.m. on February 26, 2014. Based on the contents of this 911 call, Corporal Runyan was dispatched and reported to the apartment complex on Waterfall Drive, where he discovered a distraught and injured New. Accordingly, we find that the trial court acted within its discretion in admitting this audio recording.

## B. *Jailhouse Phone Call*

[20] Sieg also claims that the trial court abused its discretion by admitting a portion of his jailhouse telephone conversation into evidence. During this call, Sieg made incriminating statements, including his admission "that [he] put [his] hands on [New]." (State's Exh. 104(b)). On appeal, Sieg analogizes his jailhouse phone call to a custodial interrogation, in which the State is prohibited from the "use of those statements unless the State can demonstrate the use of procedural safeguards effect [*sic*] to secure the defendant's privilege against self-incrimination." (Appellant's Br. p. 6). According to Sieg, the State failed to establish that certain procedural safeguards were in place during his telephone conversation, thereby rendering the contents of that conversation inadmissible. We disagree.

[21] The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." This "privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior

*Miranda* warning." *Gauvin v. State*, 878 N.E.2d 515, 520 (Ind. Ct. App. 2007), *trans. denied*. Thus, "a person who has been 'taken into custody or otherwise deprived of his freedom of action in any significant way' must, before being subjected to interrogation by law enforcement officers, be advised of his rights to remain silent and to the presence of an attorney and be warned that any statement he makes may be used as evidence against him." *Id.* "Statements elicited in violation of *Miranda* are generally inadmissible in a criminal trial." *Id.* At the time of the phone call, Sieg was incarcerated and awaiting trial; thus, he was certainly in custody. *See id.* However, his voluntary phone call absolutely does not rise to the level of an interrogation by law enforcement officers and, therefore, does not necessitate a *Miranda* warning.

[22] Nevertheless, the State contends that in *Lamar v. State*, 282 N.E.2d 795 (Ind. 1972), our supreme court "laid out five requirements for the admission of a jailhouse call." (State's Br. p. 14). The *Lamar* court required that the admission of a sound recording should be preceded by a foundation disclosing, in relevant part, "[t]hat all required warnings were given and all necessary acknowledgements and waivers were knowingly and intelligently given." *Lamar*, 282 N.E.2d at 800. Although we note that *Lamar* is distinct from the present case because it dealt with the admissibility of a tape recording of a defendant's in-custody interrogation by police officers rather than a defendant's freely-made jailhouse phone call, we nevertheless find that Sieg received adequate warnings before he made incriminating statements.

[23]   At trial, Investigator Ron Harvey (Investigator Harvey) of the Elkhart County Sheriff's Department testified that the policy of the Elkhart County Jail provides that "[a]nytime [the inmates are] out of the cell and they want to use the phone, they're allowed to use it as long as they have money on the books to make the phone call or they can make a collect call." (Tr. p. 331). Investigator Harvey explained that when an inmate makes a phone call, he or she knows that the conversation is being recorded. Specifically, at the beginning of the call, "[t]here's a preempt message telling—from Securus telling them that they are being recorded and it will be monitored by law enforcement and personnel at the jail. Also, the person who is receiving the call hears that same prompt. So they also know it's being recorded." (Tr. p. 330).

[24]   State's Exhibit 104(b), which was played for the jury, included only an excerpt from Sieg's phone conversation. This excerpt did not include the warning message. Although not admitted as evidence, a full version of the telephone conversation, which did include the warning message, was made part of the record. During the trial, Sieg objected to the admission of Exhibit 104(b) based, in part, on the fact that the excerpt omitted the warning message. He did, however, indicate that the warning message "is standard procedure with that system" and noted that he did not "want to put the . . . jury through a long—if they have to play a longer version of it." (Tr. pp. 333, 335). Moreover, Sieg himself testified during his case-in-chief he heard the warning prior to his phone call but nevertheless "was talking to [his] boss" and stated that he "put [his] hands on [New]" even though, at trial, he claimed he did so to save her life.

(Tr. p. 424; State's Exh. 104(b)). Accordingly, we find that Sieg voluntarily made incriminating statements despite receiving a warning that his phone call would be monitored and recorded by law enforcement. Therefore, the trial court acted within its discretion in admitting the audio recording into evidence.

## CONCLUSION

[25] Based on the foregoing, we conclude that the trial court acted within its discretion by admitting the challenged audio recordings into evidence.

[26] Affirmed.

[27] Bailey, J. and Barnes, J. concur