Datwone B. FRY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0709–CR–821.

Court of Appeals of Indiana.

May 9, 2008.

Transfer Denied June 26, 2008.

Michael R. Fisher, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Datwone B. Fry (Fry), appeals his convictions and sentence for murder, a felony, Ind.Code § 35–42–1–1, and attempted murder, a Class A felony, I.C. §§ 35–42–1–1, 35–41–5–1.

We affirm.

### ISSUES

Fry presents three issues for our review, which we restate as follows:

(1) Whether the trial court abused its discretion when it denied Fry's motion to exclude cell phone records because they were produced shortly before trial and because they had not been authenticated;

(2) Whether the State presented evidence sufficient to support his conviction for attempted murder beyond a reasonable doubt; and

(3) Whether the sentence is appropriate in light of the nature of the offense and Fry's character.

### FACTS AND PROCEDURAL HISTORY

On May 11, 2007, Michael Edwards (Edwards) contacted Keith Rogers (Rogers) about buying some cocaine. Rogers arranged for Edwards and DuJuan Jennings (Jennings) to meet a seller at the Snack Shack on the near north side in Indianapolis, Indiana. Rogers went to the Snack Shack first and met a man who identified

himself as "Bo." Rogers went inside with "Bo" and talked with him while waiting for Edwards and Jennings to arrive. Rogers used "Bo's" phone twice to call Edwards while Edwards and Jennings were in route to the store.

When Edwards and Jennings arrived, "Bo" suggested they go to the back of the store. As the men were walking back, "Bo" said he would not talk with both of the men, so Jennings proceeded to accompany "Bo" to the back of the store, and Edwards went to the front of the store. After "Bo" and Jennings got to the back of the store, Edwards heard three shots from that direction. Edwards ran out of the front of the store, got in his car and drove toward the back of the store. "Bo" came out, pointed a gun at Edwards and fired. Edwards returned fire with a gun that he had. Rogers, who had also run out of the front of the store, heard approximately twenty shots. Jennings died from gunshot wounds to his chest and back. Edwards fled the scene, but eventually contacted the police and identified "Bo" in a photo array by pointing out a picture of Fry.

On May 21, 2007, the State filed an Information charging Fry with Count I, murder, a felony, I.C. § 35–42–1–1; Count II, felony murder, a felony, I.C. § 35–42–1–1; Count III, robbery, a Class A felony, I.C. § 35–42–5–1; and Count IV, part one, carrying a hand gun without a license, as a Class A misdemeanor, I.C. § 35–47–2–1, part two, carrying a hand gun without a license, as a Class C felony, I.C. § 35–47–2–1. On June 8, 2007, Fry requested a speedy trial. On June 26, 2007, the State moved to amend the Information by adding Count V, attempted murder, a Class A felony, I.C. §§ 35–42–1–1, 35–41–5–1. On July 6 and 9, 2007, the State filed third-party discovery requests for incoming and outgoing calls made on certain phones on May 11, 2007. On July 25, 2007, the trial

court granted the State's motion to amend the Information, and the State added Count V, attempted murder, a Class A felony. On August 9, 2007, the State provided certain items subject to discovery, including cell phone records. The next day, on August 10, the State provided additional cell phone records

A jury trial was held on August 13, 14, and 15, 2007. The State presented evidence, including eyewitness testimony detailing the facts above, and that "Bo" was Fry. The trial court admitted as evidence the cell phone records, which corroborated the witnesses' testimony, over an objection from Fry. At the conclusion of the trial, the jury returned a verdict of guilty on Count I, murder, a felony; Count IV, carrying a handgun without a license, as a Class A misdemeanor; and Count V, attempted murder, a Class A felony. The State declined to pursue Count IV, part two, carrying a handgun without a license, as a Class C felony. On August 22, 2007, the trial court sentenced Fry to a term of sixty years on Count I, murder, and forty years on Count V, attempted murder, with those sentences to be served consecutively in the Department of Correction. The trial court found that the conviction for carrying a handgun without a license merged into the conviction for murder.

. Fry now appeals. Additional facts will be provided as necessary.

*DISCUSSION AND DECISION*

I. *Admission of the Cell Phone Records*

Fry contends that the trial court erred when it denied Fry's motion to exclude the cell phone records and admitted them as evidence. Specifically, Fry argues that the cell phone records should not have been admitted at trial because they were not disclosed to him until the Thursday and Friday before the Monday that trial

began. Further, he contends that the records are not self-authenticating and should not have been admitted at trial.

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Gauvin v. State*, 878 N.E.2d 515, 520 (Ind.Ct.App.2007), *trans. denied.* An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice. *Id.* Moreover, we will not reverse the trial court's decision to admit evidence if that decision is sustainable on any ground. *Id.*

### A. Timeliness of State Discovery Compliance

■ As to Fry's argument that the State divulged the cell phone records too late to be admitted at trial, Fry contends that he was placed in the position of either going to trial unprepared because of the State's tardiness, or waiving his right to a speedy trial. He relies upon *Biggs v. State*, 546 N.E.2d 1271 (Ind.Ct.App.1989) and *Marshall v. State*, 759 N.E.2d 665 (Ind.Ct.App.2001) for support.

First, comparing the factual situation in *Biggs*, we conclude that *Biggs* is inapplicable. The State had arrested Biggs on pending charges on March 8, 1988, and the State failed to respond to certain discovery requests until April 27, 1989. *Id.* at 1272–73. On May 1, 1989, the State moved for a trial date to be set, and Biggs' trial was set for May 18, 1989. *Id.* at 1273. Biggs and his codefendant moved to be discharged pursuant to Ind.Crim. Rule 4(C), but the trial court denied the motions. However, they were granted permission to file an interlocutory appeal based on the trial court's refusal to dismiss charges. *Id.* at 1273. On appeal, we noted that Crim. R.

4(C) required the State to bring Biggs to trial within one year of March 8, 1988, and by the trial being set for May 18, 1989, the trial had been set seventy-one days beyond that date. *Id.* at 1274. The State argued that the delay should have been attributable, in part, to Biggs' motion for continuance; however, we noted that Biggs had asked only that the trial be delayed until such time as the State had complied with Biggs' discovery requests, so that the defendants would be adequately prepared for trial. *Id.* We stated that "[t]o put the defendants in a position whereby they must either go to trial unprepared due to the State's failure to respond to discovery requests or be prepared to waive their rights to a speedy trial, is to put the defendants in an untenable situation." *Id.* We attributed the majority of the delay to the State, and, accordingly, we reversed the trial court's denial of Biggs' motion to be discharged. *Id.* at 1276.

Similarly, we conclude that *Marshall* is distinguishable from the facts before us. Marshall was arrested on March 2, 2000, and charged on March 7, 2000, requiring the State to bring Marshall to trial by March 7, 2001, pursuant to Crim. R. 4(C). *Marshall*, 759 N.E.2d at 668. However, the final trial date was set for April 25, 2001, forty-nine days beyond the one-year period provided by Crim. R. 4(C). *Id.* Marshall moved to be discharged, but the trial court denied his motion. *Id.* We concluded that the trial court had erroneously charged Marshall with the delay that resulted from a continuation of the previously scheduled trial date of August 30, 2000. *Id.* Marshall had asked for the continuance because of the State's failure to comply with discovery requests for DNA samples. *Id.* at 669. From reviewing the CCS entries and pleadings, we concluded that the delays in *Marshall* were attributable to

the State's failure to provide discovery. *Id.* at 670.

Now addressing Fry's claim, we must begin by noting that Crim. R. 4(B), rather than Crim. R. 4(C), applies, because Fry was held in jail and had moved for an early trial on June 8, 2007. Crim. R. 4(B)(1) provides:

If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar.

Since Fry moved for an early trial on June 8, 2007, the State had until August 17, 2007 to bring him to trial pursuant to Crim. R. 4(B). The State complied with Fry's discovery requests on August 9 and the trial, which began on August 13, was set within the time period allowed by the applicable provision of Crim. R. 4, which is contrary to the events in both *Biggs* and *Marshall.* Moreover, the cell phone records were obtained by third-party discovery requests, which take time. Nevertheless, although Fry takes issue with the fact that the State did not file the third-party discovery requests until July 6, we note that Fry did not make similar discovery requests until July 5. (Appellant's App. pp.

65–69).[1] Based on these facts, we cannot say that the trial court abused its discretion when it found that the State had shared the cell phone records with Fry's counsel in a timely manner as to make them available at trial.

### B. *Authenticity*

■ Fry argues that the certified cell phone records were not properly authenticated prior to admission as evidence. Specifically, he argues "the cell phone records . . . do not provide any foundation to show that those records were for the cell phone numbers to which the State purported that they related. . . . [S]uch a representation was not part of the certification by the custodian required by Evidence Rules 803(6) and 902(9)." (Appellant's Br. p. 10).

It is undisputed that the records are hearsay. *See* Ind. Evidence Rule 801(c); *see also J.L. v. State,* 789 N.E.2d 961, 963 (Ind.Ct.App.2003). Hearsay is inadmissible unless admitted under a recognized hearsay exception. Evid. R. 802. Indiana Evidence Rule 803(6), provides one such exception for records of regularly conducted business, by stating in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

\* \* \*

A . . . record . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in

---

1. Fry additionally asserts in his Brief that "[f]rom the Initial Hearing on May 22, 2007[,] until July 6, 2007[,] the State did nothing to comply with the discovery requirements mandated by local rule." (Appellant's Br. p. 8). To the contrary, we note that Fry's Appendix contains the State's Notice of Discovery Compliance, file marked June 14, 2007, listing seventy pieces of evidence, which the State had shared with Fry's counsel, and five witnesses that it may call at trial. (Appellant's App. p. 47). On June 20, 2007, the State filed a Supplemental Notice of Discovery Compliance, which announced that a crime scene video was being made available to Fry's counsel for review. (Appellant's App. p. 51). Then on July 3, 2007, the State filed another Supplemental Notice of Discovery Compliance listing six more pieces of evidence being made available to Fry's counsel and three more witnesses that it may call at trial. (Appellant's App. pp. 62–63).

the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record ... as shown by the affidavit of the custodian or other qualified witness, unless the source of information or method or circumstances of preparation indicate a lack of trustworthiness.

The certifications from the cell phone companies all stated that:

the attached are true and accurate copies of the business records of [the applicable cell phone company name] [ ] and that these records are:

1. Were made at near the time of the occurrence of the matters set forth, by or from information transmitted by a person with knowledge of those matters;
2. Are kept in the course of the regularly conducted activities of [the cell phone company's name] [ ];
3. And were made by the regularly conducted activity as a regular practice of [the cell phone company's name] [ ].

(Exhibits Vol. II, pp. 84, 116). The certifications provided by the State were evidence that the cell phone records were records of regularly conducted business, and therefore admissible hearsay. From review of this evidence, we conclude that the trial court did not abuse its discretion by concluding that the cell phone records were admissible hearsay.

▌ Nevertheless, the records still must be authenticated prior to admission as evidence. *Salone v. State,* 652 N.E.2d 552, 556 (Ind.Ct.App.1995), *reh'g denied; trans. denied.* Absolute proof of authenticity is not required. *Lahr v. State,* 640 N.E.2d 756, 761 (Ind.Ct.App.1994), *trans. denied.* Evidence that establishes a reasonable probability that the document is what it is claimed to be constitutes sufficient authentication or identification. *Dumes v. State,* 718 N.E.2d 1171, 1176 (Ind.Ct.App.1999), *clarified on reh'g.* Once this reasonable probability is shown, any inconclusiveness of the exhibit's connection with the events at issue affects on the exhibit's evidential weight. *Id.* Typically, evidence outside of an exhibit, such as authenticating witness testimony creates an inference sufficient for authentication. *Dumes v. State,* 723 N.E.2d 460, 463 (Ind.Ct.App.2000), *opinion on reh'g.* However, Indiana Evidence Rule 902 is one exception to the general requirement that other evidence establish the authenticity of an exhibit. *Id.* Rule 902 states that certain evidence can be self-authenticating, and provides in pertinent part:

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

\* \* \*

(9) *Certified domestic records of regularly conducted activity.* Unless the source of information or the circumstances of preparation indicate lack of trustworthiness, the original or a duplicate of a domestic record of regularly conducted activity within the scope of Rule 803(6), which the custodian thereof or another qualified person certifies under oath (i) was made at or near the time of the occurrence of the matters set forth, by or from information transmitted by, a person with knowledge of those matters; (ii) is kept in the course of the regularly conducted activity, and (iii) was made by the regularly conducted activity as a regular practice. A record so certified is not self-authenticating under this subsection unless the proponent makes an intention to offer it known to the adverse party and makes it available for inspection sufficiently in advance of its offer in evidence to provide the ad-

verse party with a fair opportunity to challenge it.

Fry challenges the completeness of the certification attached to the cell phone records, and in turn the propriety of self-authentication pursuant to Evid. R. 902(9). We note that the State did not share the cell phone records with Fry until the last business day before trial, and in a separate argument Fry has challenged whether the records were timely shared with him to permit them to be admissible. However, he does not make the parallel argument that the records were not "available for inspection sufficiently in advance of its offer in evidence to provide the adverse party with a fair opportunity to challenge [them]," and, therefore the documents should not be self-authenticating. Evid. R. 902(9). Regardless, our Evidence Rules identify another process for authenticating the cell phone records, which we conclude is applicable here.

■ Evidence Rule 901(b) provides a list of "examples of authentication or identification conforming with the requirements of this rule." Included in this list is 901(b)(4), which provides: *"Distinctive characteristics and the like.* Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." The cell phone records were obtained by the State serving the cell phone companies with third-party discovery requests asking for the records for specific telephone numbers during specific times. The cell phone companies responded by providing line item tables with each line containing the corresponding cell phone number and the precise minute each outbound and inbound call was either made or received from that phone number. In addition, the cell phone records contain multiple references to the account holder's name, and identifying labels of the corresponding cell phone companies. Altogether, the records contain hundreds of reference points from which it could be determined that they are the purported records for the requested cell phone numbers, and are sufficiently distinctive to qualify as self-authenticating under Evid. R. 901(b)(4). *See United States v. Thornton,* 197 F.3d 241, 250–51 (7th Cir.1999) (holding that utility bills and certain other documents were sufficiently distinctive to "qualify as self-authenticating" under Federal Rule of Evidence 901(b)(4), which is identical to Evid. R. 901(b)(4).). Furthermore, the fact that the certifications stated that the attached records were true and accurate can be considered together with the records to determine whether they were authenticated in accordance with Evid. R. 901(b)(4). We conclude that the contents of the cell phone records, considered in conjunction with the State's third-party discovery requests and the certification from the cell phone companies that the attached records are true and accurate, create a reasonable probability that the cell phone records are what they purport to be. Therefore, the trial court did not abuse its discretion when it deemed the records properly authenticated and admitted the records as evidence. *See Dumes,* 718 N.E.2d at 1176.

## II. *Sufficiency of the Evidence*

■ Fry contends that the State did not present sufficient evidence to sustain his conviction for attempted murder beyond a reasonable doubt. Specifically, he argues that the evidence was that Fry was engaged in a shoot out with Edwards at the back of the store, and from this evidence, it could not be concluded that Fry had a specific intent to kill which was required to convict Fry of attempted murder.

We have previously stated the standard of review for challenges to the sufficiency of evidence:

Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses. [ ] We will consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. [ ] A conviction may be based upon circumstantial evidence alone. [ ] Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense.

Perez v. State, 872 N.E.2d 208, 212–13 (Ind.Ct.App.2007), trans. denied (citations omitted).

 Typically, to prove that a person has committed an attempt crime, the State must show that the defendant engaged in conduct that constitutes a substantial step toward the commission of the crime attempted, while acting with the same culpability of that crime. I.C. § 35–41–5–1. However, our supreme court has emphasized the importance of requiring specific intent to kill before a defendant can be convicted of attempted murder, despite that the culpability requirement for murder includes the lesser standard of "knowingly." Zickefoose v. State, 270 Ind. 618, 388 N.E.2d 507 (Ind.1979)). Therefore, the State was required to prove that Fry acted with the specific intent to kill Edwards, and while doing so, engaged in a substantial step toward killing Edwards.

 Edwards testified that after he heard three shots in the store, he left out the front, got in his car and drove around to the back where he assumed there would be a door. Edwards watched Fry come outside, raise his weapon, aim at Edwards and begin shooting. "Intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily injury." Id. at 213 (quoting Corbin v. State, 840 N.E.2d 424, 429 (Ind.Ct.App. 2006)). "[D]ischarging a weapon in the direction of a victim is substantial evidence from which the jury could infer intent to kill." Id. From Edwards' testimony, we conclude there was sufficient evidence to prove that Fry acted with specific intent to kill and sustain his conviction for attempted murder beyond a reasonable doubt.

### III. Propriety of Fry's Sentence

 Finally, Fry argues that his sentence is inappropriate when the nature of his offense and his character are considered. Specifically, Fry asks that we consider the character of the victims and their role in the events that led to Fry murdering one, and attempting to murder another, to conclude that his total executed sentence of one-hundred years is inappropriate.

 We have the authority to review the appropriateness of a sentence authorized by statute through Indiana Appellate Rule 7(B). That rule permits us to revise a sentence if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. Anglemyer v. State, 868 N.E.2d 482, 491 (Ind.2007), aff'd on reh'g. Our supreme court has encouraged us to critically investigate sentencing decisions. See, e.g., Walker v. State, 747 N.E.2d 536, 538 (Ind.2001). The purpose of the express authority to review and revise sentences is to ensure that justice is done in Indiana courts and to provide unity and coherence in judicial application of the laws. Pruitt v. State, 834 N.E.2d 90, 121 (Ind.2005).

751

In reviewing the nature of the offense, it is apparent that Fry separated Jennings and Edwards so that he could get one of the victims alone. Fry then shot Jennings multiple times, executing him at close range. Later, when Fry was fleeing the scene of the murder, he saw Edwards, raised his gun and began shooting at Edwards. In reviewing Fry's character, we note that he was present at the scene under the auspices of making a large drug deal. As the trial court had pointed out, Fry's criminal history began in 1991 when he was approximately eleven years old, and included juvenile true findings for battery, resisting law enforcement, illegally carrying a handgun, and theft. As an adult, Fry has incurred multiple convictions for possession of cocaine, a conviction for illegally carrying a handgun, resisting law enforcement, operating a motor vehicle without a license, and operating while intoxicated. Considering the nature of the offense and Fry's character, we cannot say that the trial court's imposition of a combined one-hundred year executed sentence was inappropriate.

## CONCLUSION

For the foregoing reasons, we conclude that (1) the trial court did not abuse its discretion by admitting the cell phone records as evidence, (2) the State presented sufficient evidence to convict Fry of attempted murder beyond a reasonable doubt, and (3) the sentence imposed by the trial court was not inappropriate considering the nature of the offense and Fry's character.

Affirmed.

BAKER, C.J., and ROBB, J., concur.