# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MAUREEN T. KEEFE**
Law Office of Maureen T. Keefe
Carmel, Indiana

ATTORNEY FOR APPELLEE:

**DAVID R. ROSSELOT**
Kokomo, Indiana



FILED

Nov 20 2013, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE PATERNITY OF B.B.,    )
                                )
R.B.,                           )
                                )
    Appellant-Petitioner,    )
                                )
       vs.            )    No. 34A02-1303-JP-243
                                )
T.J.,                           )
                                )
    Appellee-Respondent.     )

APPEAL FROM THE HOWARD CIRCUIT COURT
The Honorable Lynn Murray, Judge
Cause No. 34C01-1006-JP-110

**November 20, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

R.B. ("Father") appeals the trial court's order modifying custody, visitation, and support of B.B. to T.J. ("Mother"). Father raises two issues, which we revise and restate as:

> I. Whether the court abused its discretion by admitting evidence of text messages purportedly exchanged between Father and Mother; and
>
> II. Whether the court abused its discretion by granting Mother's petition to modify physical and legal custody of B.B.

We affirm.

## FACTS AND PROCEDURAL HISTORY

B.B. was born out of wedlock to Mother and Father on July 30, 2008, and the following day the parents signed a paternity affidavit. At the time of B.B.'s birth, Father was eighteen years old, Mother was seventeen years old, and both were living in Kokomo, Indiana. On August 20, 2010, following a petition to establish paternity filed by Father, the court issued its Order Establishing Paternity and Other Matters in which it left open the matter of custody of B.B. Soon after, on August 23, 2010, Mother filed a verified petition to modify order and petition for support, the court held a hearing on March 4, 2011, and on April 11, 2011, the court issued its Order Re: Child Custody and Parenting Time awarding joint legal custody of B.B. and shared custody in which the parents exercised equal parenting time.[1]

---

[1] Specifically, regarding physical custody the court ordered that Mother "shall have physical custody . . . from Mondays 9 a.m. through Wednesdays 5 p.m. and alternate weekends, Fridays 5 p.m. to Mondays 9 a.m." Appellant's Appendix at 26. It ordered that Father "shall have physical custody . . . from Wednesday 5 p.m. to Friday 5 p.m. and alternate weekends, Fridays 5 p.m. to Mondays 9 a.m." Id. The court's order also made pronouncements regarding holidays and stated that the custodial parent must first offer the other parent the opportunity to care for B.B. should the need arise.

2

In October of 2011, Father filed a notice of intent to relocate, and Mother filed an affidavit for contempt/petition to modify custody and an objection to notice of intent to move. The court held a hearing, and on January 17, 2012, entered an order in which it noted that in the summer of 2011 Father enrolled B.B. in pre-school at St. Joan of Arc/St. Patrick campus in Kokomo ("St. Joan of Arc"), and that although Mother had initial reservations, she ultimately agreed to B.B. attending the school. The court's order noted that in October 2011, Father relocated his residence to Westfield, Indiana, approximately thirty-six miles from Kokomo, that Father advised Mother of his intent to relocate approximately two weeks in advance, and that Father filed his notice of intent to relocate three days after Mother filed her affidavit of citation/petition to modify custody. The court noted that Father, in anticipation of his move and without consulting Mother, withdrew B.B. from St. Joan of Arc and enrolled him in a pre-school at St. Maria Goretti School in Westfield. The court modified the custody and parenting time provisions of its prior order so that B.B. could continue to attend St. Joan of Arc but continued the joint legal and physical custody arrangement.[2] The court also admonished Father for his actions in enrolling B.B. in school twice without consulting Mother, and ordered him to consult with her on all major decisions affecting the child.

In February and March of 2012, both parents filed contempt citations related to the other parent claiming B.B. as a dependent on their tax returns in violation of previous

---

[2] Specifically, the court awarded Mother custody from Tuesday morning through Thursday evening, as well as alternate weekends and alternate holidays per the Indiana Parenting Time Guidelines, and awarded Father custody from Sunday evening until Tuesday morning and from Thursday evening to Friday evening, as well as alternate weekends and holidays per the Guidelines.

court orders.[3]  On May 25, 2012, Mother filed a petition to modify decree asking that the court modify custody of B.B. due to a substantial change in the circumstances of the parties, specifically stating:

(a) [Father] has re-entered into or maintained a life-style involving alcohol[.]
(b) That said lifestyle impedes his ability to operate a motor vehicle and properly care for the child.
(c) The court entered an Order of joint custody at a time when the parties were able to communicate with one another.  On or about April 22, 2012 [Mother] was told by [Father] not to call or communicate with him any further.  Communication has been terminated as a result of this incident.
(d) At the time of the Court Order [Father] had a girlfriend/wife.  A new child has been born into that relationship and [Father] has lost interest in [B.B.].
(e) That [B.B.] has grown older, can begin the "Headstart Program" in August, a five day per week school.  This option would alter the current parenting time order.  [Mother] does not intend to enroll the child in Headstart absent the Court's permission.
(f) For other unspecified reasons, it is in the best interest of the child that custody be modified.

Appellee's Appendix at 32.  In July of 2012, the parents filed a Joint Agreement for Appointment of Mediator, and on August 27, 2012, the mediator filed her report finding that mediation was unsuccessful.  Appellant's Appendix at 10.  Also, in January of 2013 both Mother and Father filed affidavits of citation for contempt alleging that the other parent denied them parenting time or visitation in violation of previous court orders.

On January 17 and January 30, 2013, the court held a hearing on the parents' various court filings.  On February 25, 2013, the court issued its order modifying custody,

---

[3] Mother claimed B.B. as a dependent on her tax return for the year 2010, which was contrary to a court order issued on August 18, 2010, and Father claimed B.B. as a dependent on his tax return for the year 2011, which was contrary to a court order issued on April 11, 2011.

4

visitation and support (the "Modification Order") and included the following relevant findings:

42. . . . . In October 2011, after relocating to Westfield, [Father] enrolled [B.B.] in pre-school at St. Maria of Goretti School in Westfield, without consulting [Mother]. . . .

* * * * *

44. [B.B.] began the fall 2012 school year on August 20, 2012, at [St. Joan of Arc]. Although [Father] had [B.B.] in his custody the first day of school, he failed to arrange for [B.B.'s] transportation, and [Mother] drove to [Father's] residence and took [B.B.] to school for his first day.

* * * * *

51. Mother and [Father] have a contentious relationship, and on most occasions fail to communicate constructively or at all. During one day in the spring 2012, [Mother] called or texted [Father] ten (10) or more times in an attempt to speak with [B.B.], which requests [Father] refused. Father contacted law enforcement alleging [Mother] was harassing him, and she was told not to contact [Father] any more in the future.

52. On November 25, 2012, the parties signed an agreement between them as to how parenting time with [B.B.] would be divided during the period December 15 through 31st, 2012. . . . At the hearing in January 2013, each parent alleged the other had violated the agreement in some respect.

53. The parents have a mutual dislike and distrust of each other. Of the two parents, [Father] is the most negative of the two in terms of his language, demeanor, and attitude toward [Mother]. In his discovery responses and hearing testimony, he indicated "none" in response to a question about [Mother's] positive attributes.

Id. at 166, 168.

The Modification Order included conclusions of law and specifically concluded that "it is in [B.B.'s] best interest that the prior orders be modified to provide that his

legal and physical custody be awarded to [Mother], and that [Father] be awarded parenting time . . . per the Indiana Parenting Time Guidelines with an additional overnight on alternate weekends." Id. at 171. Additional facts will be provided below as necessary.

I.

The first issue is whether the court abused its discretion by admitting evidence of text messages purportedly exchanged between Father and Mother. We observe that the decision to admit or exclude evidence is reviewed for an abuse of discretion. Cain v. Back, 889 N.E.2d 1253, 1256 (Ind. Ct. App. 2008), trans. denied. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or the reasonable, probable, and actual deductions to be drawn therefrom. Id. at 1257. Moreover, we will not reverse the trial court's decision to admit evidence if that decision is sustainable on any ground. Gomez v. Gomez, 887 N.E.2d 977, 982 (Ind. Ct. App. 2008).

Father argues that the court admitted as Respondent's Exhibit D a document purportedly containing text messages exchanged between the parents (the "Text Messages") "as a statement by a party-opponent" and that it "accepted [Mother's] assertion the texts were complete and accurate in spite of her inability to describe with any clarity the process she employed to transfer them from her phone to her computer, or to print them." Appellant's Brief at 7. Father argues that "[w]ritings and recordings, including text messages, must be authenticated pursuant to Ind. Evidence Rule 901 before being admitted into evidence." Id. at 8. Father argues that "[t]he messages do not appear

6

to follow or flow logically and any number of them lack context" and "appear to begin in the middle of a thought or argument." Id. at 9. Father also argues that the Text Messages "appear to have played a role in the court's decision to modify custody," noting that "paragraphs 5, 7, 8, and 11 of the Order granting modification make reference to, or appear to infer from testimony and evidence there is a change of circumstances relevant to communication between the parties." Id. Father maintains that "absent the improperly admitted text messages, the evidence the court had to consider was, at best, equivocal." Id.

Mother argues that the court did not abuse its discretion in admitting the Text Messages, noting that Mother identified the messages as being between her and Father between March 11, 2012 and June 1, 2012, that Father identified the phone numbers as his and that of Mother, that Father testified when asked to identify the Text Messages that he did not "doubt that this isn't, isn't me," and that Mother explained how she generated the document using her cell phone and a computer. Appellee's Brief at 7.

When the substance of a text message is offered for an evidentiary purpose, the text message must be separately authenticated pursuant to Ind. Evidence Rule 901(a). Hape v. State, 903 N.E.2d 977, 990 (Ind. Ct. App. 2009), trans. denied. Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Absolute proof of authenticity is not required. Fry v. State, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), trans. denied. When evidence establishes a reasonable probability that an item is what it is claimed to be, the

item is admissible. <u>Thomas v. State</u>, 734 N.E.2d 572, 573 (Ind. 2000). Ind. Evidence Rule 901(b) provides "[b]y way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule" and includes:

> Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (i) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (ii) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

Ind. Evidence Rule 901(b)(6).

When presented with the Text Messages, Father indicated that the two phone numbers featured on the document belonged to him and Mother. When he was asked whether he recognized the Text Messages, the following exchange occurred:

A    I don't doubt that this isn't, isn't me. I believe I remember this right here at the beginning, there's quite a lot here to go through . . . .

Q    Just take a glance through it and see if there's anything that sticks out and that leads you believe [sic] that's not the action transcribed message.

A    I don't doubt that it is. I would have to go through it in more detail,

Q    Do you remember making any of these calls or texts?

A    I remember vaguely the first sentence. I can't remember what the situation was though.

Q    Did you folks have telephone conversations between each other during this same period of time which would have been, these texts range from March 11th through June 1st last year, did you also talk to each other on the phone at the same time?

* * * * *

8

A.    Yes.

Q     OK.  So this wouldn't be comprehensive of all the communications you had?  These would just be indicative of the texts that went back and forth between the two of you?

A     We did things through text as well as phone conversation.

Q     OK.

A     We prefer text because it's--, we don't really talk very well together.

Q     You don't really talk well over the phone?

A     No, we don't get along.  Quite a lot of bickering so we actually preferred text.

Q     And that text preference, is that your preference as well as hers or--

A     I think that's fair to say, yes.

* * * * *

Q     And I'd like to ask you, is the language in the conversations still the same now as it is throughout these texts?

A     Actually I think it's safe to say that we've been doing better.  We do have our moments but I've been working really hard to try to do my best to get along with her for [B.B.'s] sake.

Q     OK, so you're working hard to try to improve not only the language but the demeanor and attitude that's portrayed in some of these?

A     It's not just me but yes, I have been working hard to not argue as much.

Transcript at 27-29.

Also, during Mother's testimony she was presented with the Text Messages and indicated that the document contained the text messages occurring between her and Father between March and June 1st of 2012.  She indicated that she created the

9

"document by plugging [her] phone into a computer program" which "transcribed" the text messages to the document. Id. at 70. Mother's counsel then offered into evidence the exhibit, and Father's counsel proceeded to ask Mother preliminary questions as follows:

Q    Ma'am, what program did you use to obtain these?

A    I had it saved on my flash drive. It went from my cell phone straight to my lap top [sic] to my flash drive to my computer to (inaudible) .

Q    Do you recall what the name of the program is?

A    I still have my old cell phone that has all the things on it, Microsoft, I think.

Q    So how did you obtain these printed items?

A    I don't know how the computer works. It just kind of goes through file, open, copy and paste.

Q    And you're saying this represents the entirety of all the text messages from March 11th to June 1st?

A    Yes.

Q    So this was generated by a program that you had on your phone?

A    No.

Q    OK, that's what, that's just what I'm trying for foundation purposes, what--

A    A cord, they have a cord that goes from your phone, goes to your computer and it (inaudible) file in--

Q    OK, right.

A    --goes file, open.

Q    And what program on your computer did you access?

10

A    Microsoft.

Q    Well, I'm not a computer expert but I think Microsoft is a big company that makes software. Can you remember the name of the program?

A    It's, it kind of just went to it, just a file that was open and just pasted it on Microsoft. I mean, it went straight from the phone to the computer (inaudible).

Q    So did you pick and choose between what texts are going to be on there, what days?

A    Every text should be there. It was went through, printed and given to my lawyer.

Id. at 70-71.

Following this exchange, Father's counsel objected to the entry of the Text Messages for lack of a proper foundation, arguing that there was no certification that it was an accurate or true copy and that he had "no idea what program this is accessed through, the reliability of it . . . ." Id. at 72. Mother's counsel argued that "these are text messages that [Mother] said she actually observed on her phone" and that "she did not pick or choose." Id. Mother's counsel stated that he did not "know what could be more reliable than going from the phone itself, through a cord, to the computer, and printing." Id. The court stated that it was "looking at it a little differently. This is a communication between these two people which would otherwise come into evidence as being, the declarant being the opposing party." Id. at 73. The court then said: "As long as she says on oath in reviewing that this is what either I said, texted or what I received from him as texted, I think it comes in . . . ." Id. Mother then reviewed the exhibit and indicated that

11

they were the text messages "sent to [her] or by [her] on the date specified in the document," and the court admitted the exhibit.  Id. at 75.

Also, on the second day of the hearing, Father was again asked about the Text Messages.  He testified that he had reviewed the exhibit and believed it to be inaccurate, stating that "there's stuff missing out of them and of course, it's [Mother's] stuff."  Id. at 204.  He testified that "in some of the conversations, if you just read through them you can see that they don't make sense."  Id.

Thus, Father does *not* argue that the text messages contained in the document were not exchanged between him and Mother; rather, Father's main challenge to the Text Messages is his general belief that Mother must have deleted certain text messages in order to make her appear to be the more sympathetic figure.  We note, however, that Father never directed the court's attention to a specific part of the document where he believed that content was missing, nor did he attempt to admit evidence of any deleted text messages.  As a party to the text messages, Father could have obtained a copy of the text message exchange between him and Mother on his phone, and he did not testify that a record of the text messages was unavailable to him at the time of the hearing.  We also note that the second day of the hearing took place about two weeks after the first day, that Father was recalled on the second day of the hearing and testified that the exhibit, which had already been admitted into evidence, did not contain all of the text messages, but he did not offer evidence to support his claim.

Indeed, we observe that Father's argument appears to be little more than an argument to apply the doctrine of completeness, which is a common law doctrine that

"[w]hen one party introduces part of a conversation or document, the opposing party is generally entitled to have the entire conversation or entire instrument placed into evidence." Lewis v. State, 754 N.E.2d 603, 606 (Ind. Ct. App. 2001) (quoting McElroy v. State, 553 N.E.2d 835, 839 (Ind. 1990), trans. denied), trans. denied. The doctrine of completeness has been incorporated into the Indiana Evidence Rules as Evidence Rule 106. Norton v. State, 772 N.E.2d 1028, 1033 (Ind. Ct. App. 2002), trans. denied. The rule states:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time the introduction of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously with it.

Ind. Evidence Rule 106.

The purpose of Evidence Rule 106 is to avoid misleading impressions from out-of-context statements or from the introduction of only selective parts of evidence. Lieberenz v. State, 717 N.E.2d 1242, 1248 (Ind. Ct. App. 1999) (citing 13B R. MILLER, JR., INDIANA PRACTICE § 106 at 23 (Supp. 1998)), trans. denied. The doctrine of completeness provides "context for otherwise isolated comments when fairness requires it." Barnett v. State, 916 N.E.2d 280, 286 (Ind. Ct. App. 2009) (quoting Sanders v. State, 840 N.E .2d 319, 323 (Ind. 2006)), trans. denied. Portions of evidence not expository of nor relevant to already-introduced sections of evidence need not be admitted. Id.

The purpose of the doctrine of completeness is to allow the introduction of additional material to place incomplete, misleading evidence in its full context. Nothing in the record indicates that Father sought to submit evidence of the allegedly deleted text messages. His objection was not an attempt to have the purported remainder introduced

13

into evidence, but rather an effort to wholly exclude the Text Messages. To the extent that he suggests that, without the purported omitted text messages, a misleading impression was created, we note that he did testify on the second day of the hearing that he believed certain text messages were not contained in the exhibit, the court heard Father's testimony, and we cannot say that the court failed to account for such testimony.

We find that evidence was presented sufficient to support a finding that the Text Messages were what Mother claimed them to be, and that a sufficient foundation was laid for their admission, and accordingly, we conclude that the court did not abuse its discretion when it admitted the Text Messages.

## II.

The second issue is whether the court abused its discretion by granting Mother's petition to modify physical and legal custody of B.B. We review custody modifications for an abuse of discretion and have a "preference for granting latitude and deference to our trial judges in family law matters." Kirk v. Kirk, 770 N.E.2d 304, 307 (Ind. 2002). "We set aside judgments only when they are clearly erroneous, and will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment." Id. The Indiana Supreme Court explained the reason for this deference in Kirk:

> While we are not able to say the trial judge could not have found otherwise than he did upon the evidence introduced below, this Court as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

14

Id. (quoting Brickley v. Brickley, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). Therefore, "[o]n appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." Id. In the initial custody determination, both parents are presumed equally entitled to custody, but a petitioner seeking subsequent modification bears the burden of demonstrating the existing custody should be altered. Id. We may neither reweigh the evidence nor judge the credibility of the witnesses. Fields v. Fields, 749 N.E.2d 100, 108 (Ind. Ct. App. 2001), trans. denied.

The trial court's findings were entered pursuant to Ind. Trial Rule 52(A) which prohibits a reviewing court on appeal from setting aside the trial court's judgment "unless clearly erroneous." Dunson v. Dunson, 769 N.E.2d 1120, 1123 (Ind. 2002). When reviewing the trial court's findings of fact and conclusions thereon, we consider whether the evidence supports the findings and whether the findings support the judgment. Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. Id. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. Id. In order to determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. Id.

The child custody modification statute provides that "[t]he court may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may

15

consider under [Ind. Code § 31-17-2-8] . . . ." Ind. Code § 31-17-2-21. Ind. Code § 31-17-2-8 lists the following factors:

(1)  The age and sex of the child.

(2)  The wishes of the child's parent or parents.

(3)  The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4)  The interaction and interrelationship of the child with:

    (A)  the child's parent or parents;

    (B)  the child's sibling; and

    (C)  any other person who may significantly affect the child's best interests.

(5)  The child's adjustment to the child's:

    (A)  home;

    (B)  school; and

    (C)  community.

(6)  The mental and physical health of all individuals involved.

(7)  Evidence of a pattern of domestic or family violence by either parent. . . .

Father argues that the court "improperly weighed and considered evidence presented at trial in concluding that a substantial change of circumstances occurred . . . ." Appellant's Brief at 1. Specifically, he argues that the court found in Finding 20 that each parent cared for B.B. approximately one-half of the time but the evidence presented demonstrated that he cared for B.B. "approximately two-thirds (2/3) of the time" and Mother "did not provide evidence to refute this." Id. at 13. Father notes that Finding 40

16

found that during his parenting time "B.B. spends an average of a day and/or overnight with his paternal grandfather in Kokomo" but that "it was unrefuted [La.B.] spends about three to four months out of every year in Florida, and he does not see or have B.B. during those times." Id. He asserts that Finding 41 found that he and Samantha smoke, but the court failed to account for Father's testimony that "neither [he] nor his wife smoke in their home" and "[i]f they 'smoke' in the home it is by using 'green' cigarettes." Id. Next, Father contends that in Finding 43 the court appeared to penalize Father for not contributing toward B.B.'s education despite the fact that he was not required to pay for school expenses, and it ignored the fact that he provides for all of B.B.'s transportation, which is significant. He notes that Finding 48, which addresses B.B.'s acting out in a sexual manner, "noted that [Mother] claimed [Father] knew about the behavior for one year" but "failed to note [he] denied that allegation" and "failed to find that it was [him], not [Mother], who took action to address the behavior." Id. at 14. Father also argues that Finding 51, in which the court found that Mother has called or texted him "ten or more times to speak to B.B. but [he] refused her requests" failed to recognize that in such instances there "was no emergency or other legitimate reason for the large number of calls and texts," and that Mother's behavior "rises to the level of harassment and interference, not an attempt by a concerned mother to check her child's well being." Id.

Father next maintains that the court made conclusions of law based on these erroneous findings. Specifically, Father challenges the following Conclusions of Law:

> 7.  The court further finds and concludes that since the court's prior orders awarding shared custody of the child to the parents, there have occurred substantial changes as noted in the court's findings

herein, and in particular with respect to the interaction and interrelationship of the child with each parent.

8. The parents are no longer able or willing to constructively communicate or work together on a shared custody arrangement.

9. The court further finds that it is in the best interest of [B.B.] that his primary physical and legal custody be with one parent. During the past year or more, [B.B.'s] behaviors and academic development have suffered under the shared custody arrangement.

10. As [B.B.] has grown older and is approaching a time where he will be attending school full-time, he requires a suitable and consistent stability, so that he can regard one home as his primary residence.

11. Between the two parents, [Mother] is the one who is most likely not to interfere or diminish the non-custodial parent's role with the child.

Appellant's Appendix at 171-172. Father argues that there is little in the record to support Conclusions 7 and 9, that the basis for Conclusion 8 is "likely . . . the content of the erroneously admitted text messages," and that "[w]hat is far more likely to be causing B.B.'s problems is his apparent exposure to someone or something that victimizes him sexually." Appellant's Brief at 15. Regarding Conclusion 10, he contends that "the fact that a child has grown older does not in itself constitute a substantial change of circumstances" and "the court made no finding that [Mother] would provide a more stable household." Id. at 16. Finally, as to Conclusion 11, which concludes that Mother is most likely to not interfere with Father's role in parenting B.B., he asserts that this also appears to be based upon the erroneously-admitted Text Messages and fails to account for evidence to the contrary.

Mother argues that any extra time B.B. spent with Father can be attributed to her flexibility in allowing B.B. to visit with him, including traveling to Florida, or Father

18

taking credit for overnights in which B.B. was allowed to visit with La.B. Mother states that the court "properly admonished all parties not to expose [B.B.] to smoke" in Finding 41. Appellee's Brief at 10. She argues that the evidence supports Finding 43 in that Father was able to financially contribute to B.B.'s education costs, noting that it was Father who originally enrolled B.B. at St. Joan of Arc. She maintains that, to the extent Father suggests that the transportation costs he covers offset the costs of B.B.'s education, it was Father's choice to move to Westfield and Father testified that he "offered to do that." Id. Regarding B.B.'s behavior, Mother posits that evidence in the record reveals that Father knew about such behavior for a year and, "instead of acting positively, contacted [CPS] blaming [Mother]." Id. at 11. She also argues that, as to the phone calls, "the important factor is that [Father] refused to allow her to speak to" B.B. over the phone. Id. Finally, she points to various findings and other parts of the record supporting each of the court's conclusions challenged by Father.

To the extent that Father challenges the findings of fact, we initially note that his arguments are essentially a request to reweigh the evidence and judge the credibility of the witnesses, which we may not do. Fields, 749 N.E.2d at 108. Regarding Finding 20, the court noted in that finding that the previous order in place was for the parents to have joint legal and physical custody and that "each parent has cared for [B.B.] *approximately* one-half of the time . . . ." Appellant's Appendix at 161 (emphasis added). Also, to the extent that Father challenges Finding 40 that "[d]uring [Father's] custody time, [B.B.] spends an average of a day and/or overnight with [La.B.]" and that La.B "takes [B.B.] to pre-school on Mondays and Fridays," in that the court failed to account for months La.B.

19

spends in Florida, we observe that Father gave specific testimony regarding La.B.'s participation in caring for B.B., and he indicated that La.B. transported B.B. to and from his house and that sometimes B.B. will stay overnight at La.B.'s house and noted that "[w]e try to get [B.B.] over there at least . . . once a week." Transcript at 41. It is also unclear to what extent any purported error by the court in not recognizing the time La.B. spends in Florida had on any of the relevant conclusions of law.

Regarding Finding 41, which deals with the parties' smoking habits, Finding 41 states specifically: "Mother has smoked cigarettes, but quit January 1, 2013. Her mother Angela smokes in her home. Father and his wife Samantha both smoke. [B.B.] should not be exposed to any cigarette smoke." Appellant's Appendix at 166. None of Father's arguments regarding Finding 41 refute the language of the court's finding, but Father challenges the court's failure to account for his testimony that neither he nor Samantha smoke in their home. We note, however, that the finding only mentions that Angela smokes in the home. Also, regarding Finding 43, the court specifically found that "the court's orders were silent as to the parents' responsibility to pay tuition and school expenses for" B.B. Id. Further, the court recognized in Finding 11 that Father was responsible for all transportation of B.B. to effect the joint custody schedule. Id. at 160. Father's remaining arguments regarding Findings 48 and 51 similarly impermissibly request that this court reweigh the evidence presented at the hearing.

Having determined that the court did not abuse its discretion in rendering its findings of fact, we observe that, as noted above in the conclusions challenged by Father, the crux of the court's conclusions is that the shared custody arrangement was no longer

20

viable because: 1) Mother and Father have demonstrated an inability to communicate with one another for any prolonged period of time which has impacted B.B.'s behaviors and development; 2) B.B. is approaching an age in which he will be attending school five days a week which, under the circumstances, necessitates that B.B. have a primary residence; and 3) between the two parents, Mother is most likely not to interfere or diminish the non-custodial parent's role with B.B. We note that with regard to B.B.'s need for a primary residence as he approaches the start of full-time school, both parents are in agreement and that Father specifically testified that "[w]hen it comes times for him to go to kindergarten, this will not work." Transcript at 210-211.

Regarding the parents' failure to communicate and their relative responsibility for such failure, the court made a number of findings as recited above in support of these conclusions, including that Father moved to Westfield and enrolled B.B. in preschool without consulting Mother and failed to arrange transportation for B.B. to attend his first day of school despite having B.B. in his custody. The court also specifically found in Finding 51 that the parents "have a contentious relationship, and on most occasions fail to communicate constructively or at all," and noted that Mother has on occasion called or texted Father ten or more times in a day in an attempt to speak with B.B., and Father responded by contacting law enforcement. Appellant's Appendix at 168. The court noted in Finding 52 that the parents entered into an agreement regarding parenting time during the last two weeks of December of 2012, and at the hearing in January of 2013 both parents alleged that the other had violated the agreement. Also, the court specifically found in Finding 53 that "[t]he parents have a mutual dislike and distrust of

21

each other" and that Father "is the most negative of the two in terms of his language, demeanor, and attitude toward [Mother]." Id.

We note that the testimony at the hearing supports both the findings as well as the court's conclusions. Father testified that he and Mother have problems with communication "[t]wice a week or more." Transcript at 44. He stated that "[he has] always tried to come to the middle [and] always tried to go the extra mile, over and over and over, and [he] constantly get[s] shafted for it and just got frustrated." Id. at 25. Father was asked specifically if he believed communication between Mother and him would improve if he had full custody of B.B., and his response was "I don't think our communication would be any better, no. I mean, we are gradually making progress so possibly, if we both continue to work at it." Id. at 35.

Further, the court was able to examine the Text Messages admitted into evidence by Mother which contains messages between the parents. As an example of the many messages included with a similar tenor, the Text Messages show that on April 15, 2012, Father texted Mother:

> No one is going around the truth but you. My life is great. My family and wife is great. My finances great. My physical belongs [sic] great. My job great. My. [sic] Community great. The only unsatisfactory thing about my life is you. Unfortunately conected [sic] to me like a ball n chain. You never agree. Never make your own decision never put [B.B.] first never go the extra mile for him. Your [sic] nothing but a pest that I feel sorry for out of pity. Not out of love. Your lost broke have no home can barley [sic] take care of your son, or your self. Please stop chastising me like ur fuckin honest abe.

Respondent's Exhibit D at 4.

The parents were in agreement that, because B.B. was set to begin school on a fulltime basis and the parents live in different cities, it was in B.B.'s best interest that a primary residence for him be established. The trial court was able to listen to the testimony and evidence presented and weigh the credibility of the witnesses, including evidence regarding the parents' communication with one another as well as evidence that Father had been recently convicted for OWI, and that Father filed a CPS report implicating Mother's boyfriend which was unsubstantiated. The court ruled that Mother was in the best position to act as B.B.'s primary caretaker and awarded her physical custody. After review, we cannot say that the court's findings or conclusions were clearly erroneous, and we conclude that the court did not abuse its discretion in granting Mother's petition to modify custody.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's order modifying custody, visitation and support of B.B. to Mother.

Affirmed.

NAJAM, J., and MATHIAS, J., concur.