## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 24 2016, 8:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Juwan Jones,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

May 24, 2016

Court of Appeals Case No.
71A04-1507-CR-913

Appeal from the St. Joseph
Superior Court

The Honorable John M.
Marnocha, Judge

Trial Court Cause No.
71D02-1407-F1-1

**Najam, Judge.**

## Statement of the Case

Juwan Jones appeals his conviction for attempted murder, a Level 1 felony, and aggravated battery, as a Level 3 felony, following a jury trial. Jones raises three issues on appeal which we consolidate and restate as follows:

1. Whether the trial court abused its discretion when it denied Jones' motion to dismiss the attempted murder charge.

2. Whether the State presented sufficient evidence to support his convictions.

We affirm.

## Facts and Procedural History

On July 9, 2014, between 10:00 p.m. and 11:00 p.m., Willie Menyard went with his son, Willie Thomas, to a gas station located at Western Avenue and Falcon Avenue in South Bend to fill his son's vehicle with gas. Menyard saw his niece at the gas station, spoke with her, pumped gas into Thomas' vehicle, and went inside the gas station's convenience store to pay.

While Menyard was inside the store, a red vehicle with a white top, later identified as Jones' vehicle, entered the gas station parking lot. After Menyard exited the store and had walked a few feet toward Thomas' vehicle, the passenger in the red vehicle, later identified as Jones, reached across the driver, later identified as Isaiah Samelton, and aimed a gun in Menyard's direction. Then Menyard, Thomas, and the gas station cashier, Tony Garcia, all heard a round of multiple gun shots, but none of them saw who was shooting. At that

time, Menyard was struck with a bullet which went into the right side of his back near the rib area and through his right arm. Menyard stated that the bleeding "felt like water . . . running down [his] back." Tr. at 79. Thomas drove Menyard to the hospital where Menyard's wounds were treated and Menyard was kept overnight.

[5]     In the meantime, Garcia heard several more gun shots as he observed the red and white vehicle circling the parking lot, and he called the police. Garcia then observed the red and white car pull up to the west side of the gas station, and he heard another round of gun shots, which sounded like more than one gun being shot. There were a total of twenty-three gun shots at the gas station that evening. The gas station had one operating surveillance camera on top of the entrance to its convenience store, and that camera caught video of the red and white car and the shootings.

[6]     South Bend Police Officer Greg Howard, along with other officers, was dispatched to the gas station due to a ShotSpotter[1] alert, and he arrived on the scene after Menyard had already been taken to the hospital. Officer Howard watched the gas station's surveillance camera footage, which showed that a red Buick with a light colored top, heavy damage to the driver's side door, a

---

[1] ShotSpotter is an acoustic gunshot detection and location system produced and operated by SST, Inc. that uses microphones in a geographic area to listen for the sound of gunfire. ShotSpotter detects and records the sound of gunfire and uses multilateration (similar to triangulation) to determine the location of the gunfire. It then reports that location to the local law enforcement agencies that are its customers, which here included the South Bend Police Department.

temporary license plate, and a luggage rack on the trunk was involved in the shooting. Officer Howard also had a description of the driver of the car as a black male with no shirt on and the passenger of the car as a black male with dreadlocks.

[7] A short time after viewing the surveillance footage, Officer Howard began a search for the red Buick. He saw a red Buick that matched the description of the suspect vehicle parked in front of a house on Meade Street, not far from the gas station on Western Avenue. He observed a woman and two men on the front porch of the house, and the men matched the description of the suspects. Officer Howard surveilled the house and saw the two suspects enter the red Buick and travel south. Officer Howard and another officer, Officer Anuar Velazquez, began following the red Buick. Officer Howard triggered his lights and sirens to initiate a traffic stop and the red Buick ultimately stopped on Huron Street. The passenger then exited the vehicle and started to run down a nearby alley.

[8] Officer Howard chased after the passenger while Officer Velzquez stayed with the red Buick and ultimately detained the driver, Samelton. Officer Howard saw the passenger, later identified as Jones, attempt and fail to jump over a privacy fence. At that point Officer Howard saw Jones "bobble something" and observed something drop to the ground. Tr. at 110. Jones proceeded to run through a vacant lot as Officer Howard chased after him and yelled, "Police! Stop running!" *Id*. Jones ultimately stopped and laid down, and Officer Howard detained him.

[9] Officer Howard then went back to the area by the privacy fence where he saw something fall to the ground, and he found a loaded brown handgun and a gun magazine near the handgun. Crime scene technicians also searched the crime scene areas of the gas station and the traffic stop, and they found shell casings at the gas station, a plastic bag containing a number of unfired bullets on the ground just outside the Buick's passenger-side door, two Smith and Wesson gun magazines in the Buick's glove box, and shell casings on the driver's side floor board of the Buick. The following day, Officer Howard and another officer went back to the scene of the traffic stop and found a second handgun on the other side of the privacy fence that Jones had attempted to jump over. Ballistics confirmed that the spent shell casings recovered from the gas station crime scene had been fired from the two guns recovered at the scene of the traffic stop. The crime lab also found Jones' fingerprints on the two gun magazines that had been found in the Buick's glove box.

[10] Bureau of Alcohol, Tobacco, Firearms, and Explosives Agent Sheldon Scott interviewed Jones on the night of July 9, and Jones admitted that the red Buick in which he was stopped and which appeared in the surveillance footage belonged to him and that he was in that car the entire night of July 9. Jones also admitted that the first handgun recovered at the scene of the traffic stop was his gun and that he had it with him the entire evening of July 9. Jones denied being at the gas station on July 9 and denied any involvement in the shooting. He also denied knowing Samelton. Jones subsequently made a

telephone call from jail to his mother and told her that the police "got [him] on camera." State's Ex. 100.

[11] On July 11, 2014, the State charged Jones with attempted murder, a Level 1 felony, and aggravated battery, as a Level 3 felony. On April 22, 2015, Jones filed a motion to dismiss the attempted murder charge on the grounds that the charging information failed to name an alleged victim. The trial court summarily denied that motion on the same day because the motion was untimely.

[12] Following a trial on April 22 and 23, 2015, a jury found Jones guilty as charged. On June 22, 2015, the trial court sentenced Jones to an executed term of thirty years for attempted murder and an executed term of nine years for aggravated battery, with the sentences to run concurrently. This appeal ensued.

## Discussion and Decision

### Issue One: Motion to Dismiss

[13] Jones contends that the trial court erred in denying his motion to dismiss. Jones' motion alleged that the State's failure to identify in the charging information the specific victim of the alleged attempted murder violated the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution.[2] We review a trial court's decision on a motion to

---

[2] Specifically, Jones alleged the lack of the victim's identity in the charging information denied him his federal and state constitutional rights to be informed of the nature and cause of the action against him.

dismiss for an abuse of discretion, and we reverse the decision only where it is clearly against the logic and effect of the facts and circumstances. *See, e.g.*, *State v. Gill*, 949 N.E.2d 848, 849 (Ind. Ct. App. 2011), *trans. denied*.

[14] Indiana Code Section 35-34-1-4(b)(1) (2014) requires that a motion to dismiss be filed "no later than . . . twenty (20) days" prior to the omnibus date when the defendant is charged with a felony. Here, the omnibus date was September 22, 2014. Appellant's App. at A-69; Tr. at 4. Yet Jones did not file his motion to dismiss until April 22, 2015, which was 213 days after the omnibus date. When a defendant fails to timely file his motion to dismiss, the statute provides that the trial court may "summarily den[y]" the motion if it is based on a ground specified in Indiana Code Section 35-34-1-4(a)(1)-(5). Ind. Code § 35-34-1-4(b). Jones' motion to dismiss was based upon either Indiana Code Section 35-34-1-4(a)(1) (the indictment or information is defective) or Indiana Code Section 35-34-1-4(a)(4) (the indictment or information does not state the offense with sufficient certainty). Therefore, the trial court did not abuse its discretion in summarily denying his untimely motion to dismiss.

### Issue Two: Sufficiency of the Evidence

*Standard of Review*

[15] Jones maintains that the State failed to provide sufficient evidence to support either of his convictions. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of the witnesses. *See, e.g.*, *Jackson v. State*, 925 N.E.2d 369, 375 (Ind. 2010). We consider only the

probative evidence and reasonable inferences therefrom that support the conviction, *Gorman v. State*, 968 N.E.2d 845, 847 (Ind. Ct. App. 2012), *trans. denied*, and we "consider conflicting evidence most favorably to the trial court's ruling," *Wright v. State*, 828 N.E.2d 346, 352 (Ind. 2005). We affirm if the probative evidence and reasonable inferences drawn from that evidence "could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." *Jackson*, 925 N.E.2d at 375.

### *Attempted Murder*

[16] Pursuant to Indiana Code Sections 35-41-5-1 and 35-42-1-1(1), to prove that Jones attempted to commit murder, the State was required to show that, with the intent to commit the crime of murder, Jones discharged a firearm in the direction of others with the intent to kill, which conduct comprised a substantial step toward the commission of the crime of murder. On appeal, Jones asserts that the State failed to provide sufficient evidence that (1) he discharged a firearm at the gas station and (2) he had the specific intent to kill. However, the State has met its burden.

[17] Although Jones is correct that no witness saw Jones discharge a firearm, a conviction may be based on circumstantial evidence alone. *Fry v. State*, 885 N.E.2d 742, 750 (Ind. Ct. App. 2008), *trans. denied*. Here, the State provided the following circumstantial evidence that Jones was one of the shooters at the gas station on July 9, 2014: (1) the surveillance footage from the gas station shows Jones' car entering the gas station parking lot with the dreadlocked

passenger leaning over a shirtless driver and shooting a firearm; (2) Jones admitted to his mother in a jail house telephone call that the police "got [him] on camera," State's Ex. 100; (3) Jones admitted that the car shown in the surveillance recording was his car and that he was in his car the entire evening of July 9; (4) on that same evening, after the shootings, Officer Howard spotted Jones' car in front of a house near the gas station where a man with dreadlocks (Jones) was sitting on the porch with a man with no shirt on (Samelton); (5) Officer Howard then saw Samelton and Jones get into Jones' car and drive away; (6) Officer Howard then pulled over Jones' car and saw Jones run away, attempt to climb a privacy fence, and drop an object; (7) the object Jones dropped was a gun which ballistics determined had fired the spent shell casings found at the scene of the gas station; (8) Jones admitted that the gun was his and that he had the gun with him the entire evening of July 9. This circumstantial evidence is more than sufficient to prove that Jones was one of the shooters at the gas station.

[18] The evidence was also sufficient to prove Jones fired the gun with the intent to kill. "Intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily injury." *Tharpe v. State*, 955 N.E.2d 836, 844 (Ind. Ct. App. 2011) (citing *Bethel v. State*, 730 N.E.2d 1242, 1245 (Ind. 2000)), *trans. denied*. And, "[d]ischarging a weapon in the direction of a victim is substantial evidence from which the jury could infer intent to kill." *Id.* (citing *Fry*, 885 N.E.2d at 750). Here, the evidence cited above showed that

Jones fired a gun several times in the direction of Menyard. The State provided sufficient evidence to support Jones' attempted murder conviction.

*Aggravated Battery*

[19] Pursuant to Indiana Code Section 35-42-2-1.5, to prove that Jones committed aggravated battery, the State was required to show that he knowingly or intentionally inflicted injury on Menyard that created a substantial risk of death. Jones contends that the State failed to provide sufficient evidence that Menyard's injury created a substantial risk of death.

[20] "[I]n reviewing a sufficiency claim concerning whether the injuries created a substantial risk of death, we look to the observable facts, including the nature and location of the injury, and the treatment provided." *Oeth v. State*, 775 N.E.2d 696, 702 (Ind. Ct. App. 2002) (citing *Tingle v. State*, 632 N.E.2d 345, 354 (Ind. 1994)), *trans. denied*. However, expert medical testimony is not required to prove a substantial risk of death existed. *Fleming v. State*, 833 N.E.2d 84, 88 (Ind. Ct. App. 2005) (citing *Wilcher v. State*, 771 N.E.2d 113, 117 (Ind. Ct. App. 2002), *trans. denied*).

[21] Here, the victim testified that the bullet went all the way through his back and right arm, causing so much bleeding that it "felt like water . . . running down [his] back." Tr. at 79. He also testified that his son immediately drove him to the hospital, where he was treated in the emergency room and kept overnight. In addition, the State submitted into evidence four pictures of Menyard being treated in the hospital, including up-close photographs of his still-bleeding

wounds, and these photographs were published to the jury. In *Oeth*, we found similar evidence sufficient to prove the injuries created a substantial risk of death. *Oeth*, 775 N.E.2d at 702. The evidence was sufficient to support Jones' aggravated battery conviction.

[22] Affirmed.

Riley, J., and May, J., concur.